604 So.2d 1366 (1992)
Winnie KIBBE, Plaintiff-Appellant,
v.
John Barry LEGE, Defendant-Appellee.
No. 91-233.
Court of Appeal of Louisiana, Third Circuit.
July 8, 1992.
Writ Denied November 6, 1992.
*1367 Gary Theall, Abbeville, for Kibbe.
Paul Hebert, Abbeville and Keith Rodriguez, Lafayette, for Lege.
Before STOKER, J., and CULPEPPER and SALOOM, JJ. Pro Tem.[*]
WILLIAM A. CULPEPPER, Judge Pro Tem.
This litigation began with a petition by plaintiff/defendant-in-reconvention, Winnie Kibbe, hereinafter Winnie, to evict defendant, Barry Lege, hereinafter Barry, from a 275 acre tract of land, and for a declaratory judgment as to her right to demolish a house Barry had moved onto the property. A judgment of eviction was rendered and Barry eventually vacated the premises. Barry filed a reconventional demand, alleging he had moved the house onto Winnie's property with her permission, and that in reliance on her promise to bequeath the property to him on her death, he had expended large sums of money for labor and materials to improve the property. He sought reimbursement for these sums, as well as the cost of moving the house.
Additionally, Barry alleged he had negotiated for Winnie a lease of part of the property to Pumpkin Air, a helicopter company, and that he was entitled to one-half the rent as commission. Barry's bankrupt company, Swampland Enterprises, Inc., which had furnished most of the labor and materials was ruled a necessary party. Winnie amended her petition seeking rental value of the property, use of a water well and other sums.
The trial court applied the doctrine of equitable estoppel, citing LSA-C.C. art. 1967 and cases explaining that rule. The court found (1) that Winnie had promised to bequeath Barry part of her land; (2) that Barry justifiably relied on that promise; and, (3) that he suffered injury because of that reliance. The court awarded Barry $200,000.00, of which $72,000.00 represented one-half the rent on the Pumpkin Air lease, and most of the remainder represented labor and materials furnished by Barry to Winnie. A smaller unspecified amount apparently represented enhancement in value of Winnie's property by the house, which the trial judge refused to allow Winnie to remove because of the excessive cost. These awards to Barry are offset by $20,000.00 awarded to Winnie.
The court also denied any recovery by Swampland on the basis that Winnie's promises were made to Barry individually.
Winnie appealed. Barry answered the appeal seeking an increase in his award and a reduction in Winnie's award. Winnie filed a motion to strike Barry's answer to the appeal on the ground that it was not filed within fifteen days after the return day or the lodging of the record, whichever is later. LSA-C.C.P. art. 2133. This motion was referred to the merits. The return date was February 8, 1991, the appeal was lodged March 8, 1991, and the answer to the appeal was not filed until May 20, 1991. Barry contends he did not receive from our clerk of court notice of the filing of the transcript. However, our clerk's records show the notice was mailed on March 8, 1991 to Barry's attorney of record at his correct address. We find Barry's answer to the appeal untimely and order it stricken from the record.

THE ISSUES
Winnie's appeal lists seven assignments of error. We break the assignments down *1368 into three issues: (1) Does the doctrine of equitable estoppel apply? (2) Did the trial court err in finding Barry had negotiated the Pumpkin Air lease and awarding him one-half the rent? (3) Did the trial court err in awarding to Barry damages sustained by Swampland Enterprises?

FACTS
Winnie Kibbe was married to Isaiah White. He died on July 3, 1980. They owned about 600 acres of land in Vermilion Parish. Since they had no children, Isaiah willed his interest to Winnie who is now the sole owner. Barry Lege grew up on property next to the Whites. He called Winnie "Aunt Winnie." After Barry graduated from high school he went into the service for three years. He received an honorable discharge and returned home. Barry began doing odd jobs for the Whites.
In 1978 Barry formed a construction company, Swampland Mobilized, which was the predecessor to Swampland Enterprises, Inc. This corporation filed for Chapter 11 Bankruptcy in December of 1982 and converted to Chapter 7 in July of 1983. However, it has never been dissolved and still exists.
The Whites' property is divided into five parcels. One parcel is where their house is located and another is across the road from their house where Winnie's parents lived before they died. These parcels combined comprise about 100 acres. Then there is the 275 acre block a few miles south onto which Barry later moved his house. The front portion of that parcel is the location of the Pumpkin Air lease. There is also a 160 acre tract known as the "marsh" and two smaller parcels totaling about 50 acres.
In early 1980 Barry asked permission to hunt on the "marsh." The Whites told Barry it was already leased to another party. Barry alleges that at that time Winnie told him "we know how fond you are of that property and we are going to will that property to you," and Isaiah White nodded his head.
Then in July of 1980 Isaiah White passed away and shortly before his death he asked Barry to take care of Winnie after he was gone. Barry promised he would. Winnie had one man doing work for her on a regular basis, Weston Cissac, and a few others she would hire to mend fences. After an argument, Weston Cissac quit. Winnie was upset, and Barry told her he would help her with the property. Barry alleges that Winnie again told him she would leave him some property. Barry had employees of Swampland do work on Winnie's property and they were paid by it. However, no records were kept that detailed what work was done for Winnie and what for other of Swampland's jobs. Barry alleges that his foreman, Willard Buford, went to Winnie's house every day to see what needed to be done. One or two men would work on the property every day and on weekends more would gather to round up cattle, plow, bushog and build fences. After Swampland, Inc. went bankrupt Barry did the work himself or paid other people.
Barry alleges that he went on a vacation in November of 1981, and when he returned Winnie informed him she had made a will and left him both the 275 acre tract and 160 acres of marshland. He never saw a will. Winnie denies this allegation. Barry also alleges that Winnie told him that he needed to maintain the property since it would be his. Barry stresses that his relationship with Winnie was like a mother-son, and that she told several people of her intent to leave Barry some of her property.
Barry claims that Winnie gave him permission to move a house onto her property. She denies this. Barry moved a house onto the property in August of 1982. Winnie claims she was ill at the time the house was moved onto her property, and she didn't know about it until the house mover came to her for payment. She told him to leave. Swampland eventually paid the house mover's bill. Barry raised the ground level up before putting the house on it, to prevent flooding. He refurbished the house once it was on the property, which included installing a chimney. The Abbeville Lumber Company threatened to put a lien on Winnie's property because some of Barry's remodeling bills went unpaid.
*1369 Winnie contacted her attorney, Gary E. Theall, about whether Barry would acquire "squatters rights" since he was living on her property without permission. Her attorney advised her that if she did not want to evict him, she should give him permission to be on the property so his possession would not be adverse. So Winnie had her attorney write Barry a letter stating that he could remain on the property but making it clear it was her property.
Winnie owns 100 head of cattle, and when Barry moved onto the property he bought 12 head. Barry bought feed and veterinary supplies for all of the cattle. He did not pay rent to live on the property nor to graze his cattle. He hunted on the marshland and used Winnie's bulls. Winnie paid Barry $9,000.00 for all the work that he did around the property. Barry alleges that he felt they were in a partnership.
During the time Barry lived on Winnie's property, a helicopter company, Pumpkin Air, became very interested in leasing part. The property is a portion of the 275 acre tract on which Barry's house is located. Barry alleges that a representative of the helicopter company approached him and that he then told Winnie of the company's interest. He maintains that she said she would rent it for $135.00 per acre and he told her she could get $300.00 an acre. Barry asserts she said that if he got $300.00 then she would split the rent with him. Barry believes that he negotiated this lease.
Winnie has a different version of these facts. Winnie alleges that a representative of the helicopter company came to see her and that $300.00 per acre a month was agreed to from the beginning. However, Winnie wanted to rent a minimum of 8 acres and originally the helicopter company only wanted to rent 2 or 3 acres. She asserts that she told her attorney that she would only lease the land if they leased 8 acres and to tell the helicopter company that Barry was not negotiating for her, that only her attorney was authorized. The helicopter company eventually agreed to a lease of 8 acres at $300.00 an acre per month. Winnie paid her attorney $1,000.00 in legal fees for negotiating the lease for her.
According to Barry, he continued to work on the property, even after his company went bankrupt. Barry alleges that he would gather friends to help with cattle roundups, which included his and Winnie's cattle, and Winnie would prepare meals for them. In Barry's mind nothing was wrong.
Winnie paints a different picture. She began to distrust Barry for the following reasons. He would disregard her instructions, treating her property as if he owned it. He brought many people on the property and she was afraid of her liability if anyone got hurt. He shot a boy on her property with a pellet gun which gave her further concern about liability. He stored wet hay in her barn after being warned about the possibility of spontaneous combustion and two weeks later the hay ignited and the barn burned down and a worker was injured. He roped and dragged some of her cattle after she told him not to. She asserts that often his eyes were glassy and he began to get the reputation of being a drug dealer.
On April 22, 1986 Winnie had her attorney draw up a letter to Barry demanding that he vacate the premises by the end of May. Barry was surprised. The eviction suit was filed when he refused to leave. He agreed to move the day of the eviction trial and consented to a judgment of eviction. He finally vacated the premises one month later. The judgment of eviction is now final.
Winnie also asked for declaratory judgment as to whether she could have Barry's house removed or destroyed at his expense. Barry at this point filed a reconventional demand claiming he had Winnie's permission to put his house on her property, and that she told him the property would be his one day. He also alleged he had relied on her promises when he and people he hired did work on the property, and that he was the one who negotiated the Pumpkin Air lease for which she agreed to pay him one-half the rent. He asked for reimbursement *1370 for money spent on the property, for one-half the rent and the cost of moving his house.
Winnie then amended her petition to ask for the rental value of the property on which Barry's house was located, use of the well water, value of the barn, pasturage, medicine, feed, mental anguish and physical deterioration.
Barry then amended his petition to ask for even more money, ultimately asking for $397,500.00 or declaratory judgment that he is entitled to the land since he did not receive it through legacy.
The trial judge ruled Swampland to be a necessary party. The trustee of Swampland Enterprises, Inc. agreed to divide the proceeds of the lawsuit with Barry, the trustee to recover 25% and Barry 75% after all costs were paid.
The trial judge applied equitable estoppel. He awarded Barry $200,000.00, with a setoff to Winnie of $20,000.00. Nothing was awarded to Swampland because Winnie's promises were directly to Barry.

EQUITABLE ESTOPPEL
The trial judge applied equitable estoppel. This doctrine was codified in LSA-C.C. art. 1967 as revised and amended in 1984. That article states:
Cause is the reason why a party obligates himself.
A party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying. Recovery may be limited to the expenses incurred or the damages suffered as a result of the promisee's reliance on the promise. Reliance on a gratuitous promise made without required formalities is not reasonable.
The Supreme Court of Louisiana defined equitable estoppel in Wilkinson v. Wilkinson, 323 So.2d 120 (La.1975) as:
Equitable estoppel, or "estoppel in pais," can be defined as the effect of the voluntary conduct of a party whereby he is barred from asserting rights against another party justifiably relying on such conduct and who has changed his position to his detriment as a result of such reliance. Thus, there are three elements of estoppel: (1) a representation by conduct or word; (2) justifiable reliance; and (3) a change in position to one's detriment because of the reliance.
It is difficult to recover under a theory of equitable estoppel, as estoppels are not favored. Wilkinson, supra. According to Rodden v. Davis, 293 So.2d 578 (La.App. 3rd Cir.1974), writ refused, 296 So.2d 832 (La.1974).
The cases holding that estoppel is not favored by our courts are legion. One who seeks to avail himself of the application of the principle must establish his right to do so with unusual clearness. A party may not invoke the doctrine of equitable estoppel except in good faith and after having exercised such diligence as would reasonably be expected under the prevailing circumstances to avoid mistake or misunderstanding.
All estoppel claims must be examined carefully and strictly. Lamb v. Lamb, 460 So.2d 634 (La.App. 3rd Cir.1984), writs denied, 462 So.2d 1249 (La.1985) and 462 So.2d 1250 (La.1985).
In this case the questions to be answered are: (1) Did Winnie Kibbe make representations to Barry Lege on which he relied? (2) Was his reliance on these representations justifiable? (3) Did this reliance work to Barry Lege's detriment?
It appears from the record and depositions that Winnie Kibbe did tell Barry Lege she would leave him some of her property on her death. The trial judge observed the witnesses at the trial and determined Winnie had made such a representation. The trial judge is in the best position to evaluate the credibility of witnesses. Therefore, the reviewing court must give great weight to his factual conclusions. White v. Picou's Builders Supply Company, 432 So.2d 986 (La.App. 1st Cir.1983).
Barry relied on Winnie's promise to leave him property at her death, and he and his *1371 employees performed a great deal of uncompensated work on the property with the expectation it would one day be his.
The substantial issue is whether or not Barry's reliance was justifiable. The doctrine of equitable estoppel does not apply when reliance is not justified. Winnie may have told Barry she would leave him her property but was Barry justified in relying on this promise to the extent of performing a large amount of work for which he was not paid. The record shows that Barry was paid $9,000.00 for labor and materials, but their value was a great deal more. Barry and the employees of Swampland Enterprises did a substantial amount of labor on Winnie's property, including cattle roundups, fence building and mending, and bridge building, as well as other ordinary labor.
Barry's reliance was not justified in this situation for the following reasons. LSA-C.C. art. 1967 expressly states that "Reliance on a gratuitous promise made without required formalities is not reasonable." Barry never saw a will. There was no will. Even if one had existed, his reliance on it would not have been reasonable. LSA-C.C. art. 1976 states, "Future things may be the object of a contract. The succession of a living person may not be the object of a contract other than an antenuptial agreement. Such a succession may not be renounced." The comments to LSA-C.C. art. 1976 tell us that "a contract for the succession of a living person is null even if made with that person's consent."
The Louisiana Supreme Court, in Succession of Moran, 535 So.2d 369 (La.1988), interpreted LSA-C.C. art. 1976 and held that "Strong public policy considerations militate against contracting with regard to the succession of a living person and in favor of a testator having the power to revoke his will." Even if Barry and Winnie had made a written contract concerning Winnie's succession it would not have been enforceable, and Barry would not have been reasonable in relying on such a contract. But they did not have a contract. Barry only had Winnie's oral promise. Thus, since he could not rely on a written contract regarding Winnie's succession, he certainly is not justified in relying on only her oral promise.
LSA-C.C. art. 1690 declares that "testaments are revokable at the will of the testator until his decease." This article also supports our conclusion that Barry was not justified in relying on Winnie's promise to leave him property.
The doctrine of equitable estoppel is not favored and in this instance one of the elements is lacking, justifiable reliance. Thus, equitable estoppel does not apply.

QUANTUM MERUIT
After careful consideration of the record and transcript this court finds that Barry Lege is entitled to recover under the theory of quantum meruit. Barry Lege did not plead quantum meruit in the alternative. However, in Terral v. Bearden, 338 So.2d 141 (La.App.2d Cir.1976) the court allowed recovery under quantum meruit even though the plaintiff had not pleaded it in the alternative. In Terral, supra, the court relied on Paxton v. Ballard, 289 So.2d 85 (La.1974). In Paxton the court held the reason for requiring that quantum meruit be specially pleaded in the alternative was to avoid surprise and resulting injustice. But where the adverse party was given "fair notice" by factual pleadings of what the other party was seeking, there was no surprise and the technical requirement of a special pleading may be lifted. In the instant case we find that Winnie had "fair notice" as to what Barry was seeking, as set forth in the factual pleadings. LSA-C.C.P. art. 862 also supports this courts authority to allow recovery under quantum meruit even though it was not specifically pleaded:
"Except as provided in Article 1703, a final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings and the latter contained no prayer for general and equitable relief."
Quantum meruit is explained in Coastal Timbers, Inc. v. Regard, 483 So.2d 1110 (La.App. 3rd Cir.1986):

*1372 Quantum meruit is an equitable remedy, based on former LSA-C.C. Article 1965,1 which provided that "no one ought to enrich himself at the expense of another," and on LSA-C.C. Articles 2292-2294, relating to quasi-contracts. Where there has been an enrichment in the absence of a contract, the law implies a promise to pay a reasonable amount for the labor and materials furnished. Swiftships, Inc. v. Burdin, 338 So.2d 1193 (La.App. 3d Cir.1976); Bordelon Motors, Inc. v. Thompson, 176 So.2d 836 (La.App. 3d Cir.1965). Recoverable items include the actual cost of materials and labor, including general overhead, and a reasonable or fair profit. Houma Armature Works & Supply, Inc. v. Landry, 417 So.2d 42 (La.App. 1st Cir.1982); Skains v. White, 391 So.2d 1327 (La.App. 2d Cir.1980); Brummett v. Hamel's Dairy, Inc., 324 So.2d 502 (La.App. 2d Cir.1975). The goal of quantum meruit is to compensate the claimant with a reasonable amount in return for his labor and materials.
In Coastal Timbers, supra, the owner of a contracting firm, Mr. Folse, agreed to replace a pier owned by his neighbor, Mr. Regard. There was a disagreement as to the basis of payment for the work. The pier owner, Mr. Regard, asserted that Mr. Folse agreed to build the pier in exchange for another tract of land Mr. Regard owned. Mr. Folse, the owner of the construction firm, asserted that he agreed to build the pier for $45.00 per foot. Mr. Regard refused to pay the bill and Mr. Folse sued. Mr. Regard reconvened for damages due to faulty construction, use of existing materials in the new pier and failure to remove all the old pilings. The third circuit found no contract existed between Mr. Folse and Mr. Regard but found that Mr. Folse was entitled to an award in quantum meruit to prevent the unjust enrichment of Mr. Regard at the expense of Mr. Folse.
In the present case there was no contract between Winnie and Barry. Barry and employees of his company, Swampland, did a great deal of work on Winnie's property. Barry was paid only $9,000.00 for this work. He performed this work without sufficient compensation because of Winnie's statements that she would leave him her property. While Barry is unjustified in such reliance as discussed supra, Winnie would be unjustly enriched at the expense of Barry if Barry is not allowed to recover the value of his services. Thus, under quantum meruit Barry is entitled to recover.
Royal Const. Co., Inc. v. Sias, 496 So.2d 1301 (La.App. 3rd Cir.1986) discusses the amount of recovery under quantum meruit:
The plaintiff who establishes his right to be compensated on quantum meruit should recover as much as he is reasonably entitled for his services, or for the labor and materials he furnished for the defendant's benefit. The amount the plaintiff can recover, however, is subject to a double limitation: (1) He cannot recover more than the actual value of the materials and labor furnished, including a fair profit; and (2) He cannot recover more than the amount by which the defendant was enriched by his furnishing of labor and materials.
. . . . .
The assessment of an award on quantum meruit can be analogized to the assessment of an award for damages. A court may not award speculative damages which have not been established with some degree of detail and specificity. Smith v. First National Bank of Deridder, 478 So.2d 185 (La.App. 3rd Cir.1985); Smith v. White, 411 So.2d 731 (La.App. 3rd Cir.1982).
The trial court found the actual value of the labor and materials furnished by Barry to Winnie was at least $128,000.00 ($200,000.00 award less $72,000.00 Pumpkin Air rentals) less a small amount for enhancement in value of Winnie's property by the house. We find no manifest error in this factual conclusion. And, we find from our independent study of the record that Winnie was enriched by this labor and materials, at least to the sum awarded. Thus, Barry is entitled to an award in quantum meruit in the sum of $128,000.00 less the *1373 enhancement in value of Winnie's property by the house.

PUMPKIN AIR LEASE
The trial court awarded Barry $72,000.00, which totals half of the first five year's rent on the lease to Pumpkin Air. Barry alleges that Winnie agreed to pay him half the rent if he would negotiate the lease for her. There was no written contract between Winnie and Barry for the negotiation of this lease, so Barry had to prove at trial that an oral contract existed between them. In Louisiana the parol evidence rule is set forth in Civil Code Article 1846:
When a writing is not required by law, a contract not reduced to writing, for a price or, in the absence of a price, for a value not in excess of five hundred dollars may be proved by competent evidence.
If the price or value is in excess of five hundred dollars, the contract must be proved by at least one witness and other corroborating circumstances.
Barry offered his testimony as well as the testimony of Roger Gallagher, a pilot for Pumpkin Air, to prove the existence of an oral contract between himself and Winnie that Barry was to negotiate the Pumpkin Air lease.
However, Roger Gallagher testified that Winnie told him Barry was going to manage the lease for her, not negotiate it for her. This does not corroborate Barry's testimony. There are no facts to indicate that after the lease went through Barry managed the lease for Winnie. Winnie paid her attorney, Gary E. Theall, $1,000.00 to negotiate this lease for her. While the court of appeal owes great deference to the trial judge's conclusions as to credibility and facts, it is not required to accept his unreasoned findings as to either. Wilson v. Jacobs, 438 So.2d 1119 (La.App. 2nd Cir.1983), writs denied, 443 So.2d 586 (La.1983) and 443 So.2d 587 (La.1983). Barry has not carried his burden of proving an oral contract existed between Winnie and Barry for the negotiation of the Pumpkin Air lease. Thus, that part of the lower court's award to Barry of $72,000.00 for rent on the Pumpkin Air lease is reversed.

SWAMPLAND ENTERPRISES
Winnie asserts that the trial court erred in awarding damages to Barry incurred by Swampland Enterprises. The trial judge ruled Swampland a necessary party and Swampland became a party as plaintiff-in-reconvention against Winnie. Swampland filed for bankruptcy in December of 1982. There was an agreement between the trustee of Swampland and Barry that Swampland would receive 25% of all monies recovered from Winnie.
The judgment appealed makes no award to Swampland from Winnie or from Barry. Swampland has not appealed or answered the appeal, so we cannot amend the judgment in its favor. The sole issue is whether the trial court erred in awarding to Barry reimbursement for labor and materials paid for by Swampland.
The theory of recovery under quantum meruit is that although there is no contract, the law implies a promise to pay a reasonable amount for labor and materials furnished. Winnie dealt only with Barry. She did not know Swampland was paying for the labor and materials furnished before it took bankruptcy in 1982. Any implied promise by Winnie to pay for this labor and materials was to Barry, not to Swampland.
We conclude the trial court did not err in awarding to Barry recovery for labor and materials actually paid for by his corporation, of which he was sole owner and stockholder. Any accounting between Swampland and Barry is a separate issue not before us.

THE HOUSE
Winnie's original petition for eviction also sought a declaratory judgment as to her right to demolish the house under LSA-C.C. arts. 495 or 497. Under the facts found, neither of these articles is applicable. The judgment appealed does not mention the house. However, the trial judge's written reasons discuss the testimony *1374 of Winnie's and Barry's experts. Barry's expert estimated the value of the house at $50,000.00 and the site improvements at $20,000.00 for a total of $70,000.00 as of July 20, 1987. Winnie's expert appraised the value of the house at $6,000.00 on January 31, 1991, due to disrepair and neglect after Barry vacated the premises. The trial judge states the present condition of the house is not Barry's fault because he was not allowed back on the property. The court stated it would not order the removal of the house because Barry's expert testified it would cost $8,000.00, but the court did feel that the house enhances the value of Winnie's property despite its state of disrepair.
The trial judge's award of $200,000.00 to Barry apparently includes some amount for enhancement of the value of Winnie's property.
In her appellate brief Winnie cites LSA-C.C. art. 493 which states the applicable law in pertinent part as follows:
Buildings, other constructions permanently attached to the ground, and plantings made on the land of another with his consent belong to him who made them. They belong to the owner of the ground when they are made without his consent.
When the owner of buildings, other constructions permanently attached to the ground, or plantings no longer has the right to keep them on the land of another, he may remove them subject to his obligation to restore the property to its former condition. If he does not remove them within 90 days after written demand, the owner of the land acquires ownership of the improvements and owes nothing to their former owner.
Applying art. 493 to the present case, the house was placed on Winnie's property with her consent so it belongs to Barry and he has the right to remove it, subject to the obligation to restore the property to its former condition. Barry has made no effort to exercise this right. Winnie has the right to demand by written notice that Barry remove the house within 90 days or else she acquires it without paying Barry anything. Winnie has made no such request.
Since we have the whole record before us, we will, in the interest of judicial economy, amend the judgment appealed to grant a declaratory judgment stating the rights of the parties under LSA-C.C. art. 493 as set forth above. In addition, we will find the trial judge included in his $200,000.00 award to Barry the sum of $10,000.00 as the amount of enhancement in value of Winnie's property. This $10,000.00 must be deducted from the net award to Barry.

NET AWARD
The trial court awarded Barry a total of $200,000.00 with a set off to Winnie of $20,000.00. However the trial court did not give Winnie credit for the $9,000.00 she paid Barry, thus Winnie's offset is $29,000.00. From Barry's award $72,000.00 will be deducted, as that part of the trial court's judgment awarding Barry one-half the rent from the Pumpkin Air Lease is reversed. We also deduct $10,000.00 as the enhancement in value of Winnie's property by the house. Thus Barry Lege's net award must be reduced to the sum of $89,000.00.

DECREE
For the reasons assigned, the judgment appealed is amended to reduce the net award to Barry Lege from $180,000.00 to $89,000.00.
The judgment is further amended to include a declaratory judgment that the rights of the parties to the house built by Barry Lege on Winnie Kibbe's property with her consent are as set forth in LSA-C.C. art. 493.
Otherwise, the judgment appealed is affirmed, except that costs in the trial court are assessed one-half each to appellant and appellee, as are all costs of this appeal.
AFFIRMED, AS AMENDED.
NOTES
[*] Judge William A. Culpepper, Retired, and Judge Kaliste J. Saloom, Jr., participated in this decision by appointment of the Louisiana Supreme Court as Judges Pro Tempore.