629 So.2d 1225 (1993)
VAUGHAN CONTRACTORS, INC.,
v.
Jules CAHN and Emile Cahn.
No. 93-CA-0008.
Court of Appeal of Louisiana, Fourth Circuit.
November 30, 1993.
Order Denying Rehearing January 14, 1994.
Robert H. Matthews, DeRussy, Bezou & Matthews, New Orleans, for plaintiff/appellee.
Gordon F. Wilson, Jr., Friend, Wilson, Draper, Hubbard & Bowling, New Orleans, for defendants/appellants.
*1226 Before CIACCIO, PLOTKIN and WALTZER, JJ.
PLOTKIN, Judge.
Defendants Jules and Emile Cahn ("the Cahn brothers") appeal a trial court judgment awarding plaintiff Vaughan Contractors, Inc. $30,000 in this demolition contract dispute. We affirm.
The Cahn brothers owned the property at 408 Howard Avenue in the City of New Orleans on December 24, 1989, when the building, which was leased to Pelican Ice Co., suffered serious fire damage during an unusually severe freeze. Thereafter, the City insisted that the building be demolished. Time was of the essence because of concern that some of the walls of the building which were left standing might collapse into the street and hit a passing vehicle or hit one of the homeless people who were known to inhabit the area. In fact, the street had to be closed until the building was demolished.
Jules Cahn's son, Jimmy, solicited bids from a number of demolitions contractors, including the plaintiff, Vaughan Contractors, which offered an initial oral bid of $46,000 to do the work; another contractor, L & M Demolition and Hauling, Inc., submitted the lowest bid of $40,000. Thereafter, the City indicated to the Cahns that it would prefer to have Vaughan Contractors do the work since City personnel were familiar with that company's work. After negotiations with Jules Cahn, H.P. Vaughan submitted a written bid from his company for $40,000.
Thereafter, Vaughan Contractors and the Cahn brothers entered a written contract on January 5, 1990. The contract was prepared by Vaughan and appeared on his company stationary. Among the provisions of the contract was the following: "All salvaged materials shall become the property of Vaughan Contractors, Inc. and shall be removed along with the trash and debris. Salvaged materials shall include contents, installed equipment as well as the complete building." Vaughan Contractors obtained a City permit to perform the demolitions operation on January 10, 1990.
Meanwhile, the federal Bureau of Alcohol, Tobacco, and Firearms (ATF) was conducting an arson investigation on the property. Therefore, when Vaughan Contractors workers reported to the site to perform the demolition on January 11, 1990, they were not able to begin operations. Vaughan testified at trial that they did some work at the request of ATF in an attempt to avoid losing money.
Moreover, the demolitions operations was further delayed by a dispute over ownership of some of the equipment in the building, which the Cahn brothers had told Vaughan would be part of the salvage. Although Pelican Ice personnel had reportedly initially told the Cahns that they did not want the equipment, they later changed their mind and decided they did want it. Vaughan Contractors originally disputed Pelican Ice's right to the property, but later gave up any claim to the equipment. However, the dispute and the resulting necessity to postpone the demolitions to allow removal of the equipment prevented Vaughan Contractors from commencing operations at least until January 24, 1990.
On that date, January 24, 1990, Jules and Jimmy Cahn met with Vaughan, Pelican Ice owner Arthur Renaudin, and City Inspector Eugene F. Higbee to discuss the situation. During the course of that meeting, Vaughan submitted a letter to Jules Cahn; that letter stated, in pertinent part, as follows:
Please be advised that due to the fact we are not allowed to work and the dangerous and deteriorating condition of the walls and steel work, our insurance is being removed as of January 24, 1990 as [sic] 12:00 p.m. We cannot assume any liability of any kind on this job. With the insurance adjustment not being completed and a salvage operation about to begin and not being allowed to continue the job, we have no alternative but to terminate our contract....
If at a later date you want to demolish this building we will be happy to re-bid this job.
Vaughan testified at trial that he wrote the letter in an attempt to avoid liability for injury to any of the people who were running around the site, especially to Pelican Ice workers, who Vaughan felt were engaged in *1227 some dangerous practices in attempting to remove Pelican's equipment. Vaughan said that all the parties understood that the letter was written in an attempt to avoid liability and that all the parties knew that he would return to the project at the original price after Pelican Ice's equipment had all been removed.
However, both Jules and Jimmy Cahn testified that the letter was a complete surprise to them, although Vaughan had previously threatened to quit the job several times and had in fact removed his workmen on a couple of different occasions. Both Jules and Jimmy Cahn said that Vaughan presented the letter, then immediately left the meeting; they insisted that the parties never had any understanding that Vaughan would be able to come back to the project at the original price once the equipment was removed.
Of course, the City was still anxious to have the building demolished. Therefore, according to the Cahns, Jimmy once again began soliciting bids. Meanwhile, the Cahns also continued to negotiate with Vaughan. For example, Jimmy Cahn secured a letter from Renaudin, in which Pelican Ice indemnified the Cahns and their "demolition contractor against damage to any equipment owned by Pelican Ice and presently remaining in the ... building; provided the contractor expends his best efforts to avoid additionally damaging said equipment...." Jimmy Cahn faxed that letter to Vaughan on January 30, 1990, but Vaughan still refused to return to the project, saying that he did not trust Pelican Ice and that the "best efforts" language concerned him.
Then, on the morning of Friday, February 2, 1990, Jules Cahn had a telephone discussion with Vaughan, in which he unquestionably told Vaughan that he could perform the job for the original $40,000 contract price; all parties agree that that conversation occurred. However, Vaughan was seeking $3,000 in standby charges, which Jules Cahn refused to pay. Therefore, Vaughan told Jules Cahn that he would call him back that afternoon to give him an answer.
Vaughan claims that he told Jules Cahn that he would call him back about 1 p.m. Further, he claims that he tried to call Jules Cahn several times, beginning about 1 p.m., but that he was unable to reach Jules Cahn until about 4 p.m. At that time, he told Jules Cahn that he would perform the work for the original contract price and that he was giving up his claim for standby charges. However, Jules Cahn told him that he had already let the contract to another company.
Jules Cahn testified that he did not believe that Vaughan would call him back, so he contacted someone named "Mitchell" from L & M Demolition. Mitchell came to the site immediately and submit a bid, which Jules Cahn accepted in writing on February 3.
Vaughan testified that he reported to the site on Monday, February 5, but could not perform any work because the gate was locked. The Vaughan Contractors crew reported again on Tuesday, February 6, found the gate open, and worked all day, Vaughan said. Then, on Wednesday, February 7, Vaughan's crew was removed from the site by the New Orleans Police Department. L & M subsequently completed the project. Vaughan filed the instant suit for breach of contract.
The case was tried to a jury, which returned a verdict in favor of Vaughan Contractors, awarding the company $30,000. The verdict form presented to the jury and the answers provided read as follows:
1. Was [sic] Jules Cahn and Emile Cahn justified in believing the contract was terminated and obtaining another contractor to perform the demolition work?
 YES X 
 NO ___
2. Did Jules Cahn and Emile Cahn breach the contract in such a way as to make them responsible for damages and/or labor, and material to Vaughan Contractors?
 YES X 
 NO ___
If the answer is NO, please sign and return to court.
If the answer is YES, please answer question # 3.

*1228 3. Did Vaughan Contractors suffer any damages as a result of a breach of contract by Jules Cahn and Emile Cahn?
 YES X 
 NO ___
If answer is NO, please sign and return to court.
If answer is YES, please answer question # 4.
4. What amount of damages and/or labor, and material, if any, in total, would you award to Vaughan Contractors for the breach of contract in this matter?
 $30,000
The trial court entered judgment for $30,000 in favor of Vaughan. After their motions for judgment notwithstanding the verdict (JNOV) were denied, the Cahn brothers appealed, assigning a single assignment of error. Both on their motion for JNOV and on appeal the Cahn brothers claim only that the jury interrogatories were misleading, inconsistent, and did not conform to the law. They claim that the jury's answer to interrogatory # 1 is an implied indication that the jury did not believe that they breached any contract with Vaughan Contractors. Thus, the Cahn brothers argue, the answers to the other interrogatories are inconsistent with the answer to the first interrogatory, requiring reversal of the judgment. The problem was caused, the Cahn brothers claim, by the trial court's improper omission of an instruction that the jury simply sign the form and return it to the court if it answered the first question "No."
However, the record reveals that the Cahn brothers never objected to the jury interrogatories in the trial court before the jury retired for its deliberations, as required by law in order to preserve the issue for appeal. See La.C.C.P. art. 1812. By failing to make an objection to the interrogatories before the interrogatories were presented to the jury, the defendants waived their right to have the issue considered on appeal. Soares v. Lewis, 566 So.2d 129 (La.App. 5th Cir. 1990); Streeter v. Sears, Roebuck & Co., Inc., 533 So.2d 54 (La.App. 3d Cir.1988), writ denied, 536 So.2d 1255 (La.1989).
Additionally, we note that the jury's decision in this case was purely a factual call. Certainly, the record contains sufficient evidence to support the jury's ultimate conclusion that the Cahn brothers breached an oral contract with Vaughan Contractors when it let the contract to the other company.
The Louisiana Supreme Court, in a trilogy of recent cases, has consistently instructed the courts of appeal to give great, "even vast," deference to findings of fact made by the trial court. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993). With each pronouncement, the Supreme Court's language becomes stronger, consistently admonishing courts of appeal that error correction in factual disputes is virtually non-existent.
First, the Supreme Court held, in Rosell v. ESCO, 549 So.2d 840 (La.1989), that when "a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong." Id. at 845. In fact, after Rosell, the only factual findings subject to reversal were those "[w]here documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story." Id.
The Rosell language was further developed in Stobart v. State, through DOTD, 617 So.2d 880 (La.1993), which emphasized the principle that a factfinder's choice between two permissible views of the evidence "cannot be manifestly erroneous or clearly wrong." Id. at 883. The principle is then reaffirmed in Youn, 623 So.2d 1257, which discusses the "vast" discretion afforded a factfinder in reference to setting damage awards, and concludes that "an appellate court should rarely disturb an award of general damages." Id., 623 So.2d at 1261.
The Supreme Court's indication that a trial court judgment should rarely be disturbed can only mean that reversal of a judgment is warranted only in those rare cases where the record contains little or no evidence to support the trial court's conclusions. In the instant case, the trier of fact, the jury, was faced with two different versions *1229 of the facts leading up to the defendants' decision to award the contract to L & M Demolition, rather than Vaughan Contractors. The jury chose to believe Vaughan's version of the story. That decision is supported by the record, and, thus, is not subject to reversal.
Despite the fact that the jury's factual conclusions in this case are supported by the record, the dissent would reverse the trial court judgment on the basis of a legal error which was not raised by the parties in either the trial court or the appeals court. The question of whether Vaughan proved the existence of an oral contract to perform the demolition was not even presented to the jury in this case; moreover, the Cahn brothers never objected to that omission in the trial court. Additionally, the issue was not briefed by the parties in this court. Under the circumstances, it would be inappropriate for this court to reverse a trial court judgment on the basis of a legal issue never asserted by the parties. In fact, the dissenting judge herself notes that it is inappropriate to consider legal issues not raised in the trial court nor briefed in this court when she refuses to consider awarding quantum meruit to Vaughan, despite her admission that he would be entitled to such recovery, simply because he failed to raise the issue at trial.
Accordingly, the trial court judgment awarding Vaughan Contractors $30,000 against the Cahn brothers for breach of the demolition contract is affirmed in all respects.
AFFIRMED.
CIACCIO, J., concurs with reasons.
CIACCIO, Judge, concurring with reasons.
I concur.
I find no error in the jury's finding that the Cahns breached the contract and were liable to Vaughan for the breach.
The jury could have concluded that the original demolition contract was terminated by the Vaughan letter of January 24, 1990 with a verbal understanding that an identical but new contract was to be entered into when Pelican Ice Co. finished its salvage work. The fact that Vaughan left his large crane and other equipment on the job site leads to this conclusion. The jury could have also found that Cahn believed the contract was terminated and could have let the job to another contractor.
The jury could have finally concluded that the Cahns obligated themselves to Vaughan under a new contract and breached it by hiring L & M. The record supports this version.
The parties agree that Vaughan and Jules Cahn had a telephone conversation regarding the demolition contract on the morning of February 2, 1990 with Vaughan requesting the payment of standby charges. They agree that Cahn refused to pay the charges and that Vaughan told Cahn he would call him back that afternoon.
Although there is a conflict regarding the rest of the conversation the jury could have concluded and the record supports Vaughan's version. Vaughan testified that Cahn would not agree to the standby charges but offered to allow Vaughan to finish the demolition work under the terms of the original contract.
The parties agree that Vaughan reached Cahn by telephone that afternoon, that Vaughan told Cahn the offer was accepted but Cahn told Vaughan he was too late as he had already given the contract to another company.
Vaughan protested this action, wrote a letter to Cahn on February 5, 1990 affirming the existence of the contract and of his presence on the job site to resume work.
Under these facts the jury could have concluded that the Cahns had a binding agreement with Vaughan and breached it by giving the demolition work to another contractor. I find no error in this conclusion.
The record preponderates in favor of Vaughan's version of the February 2, 1990 telephone conversation. It supports a factual finding that Cahn offered to renew the original demolition contract without the payment of standby charges and that Cahn agreed to give Vaughan time to consult with his associates and to communicate his acceptance or *1230 rejection of those terms before that afternoon.
The parties agree that Vaughan told Cahn of his acceptance of the offer at 4 P.M. that afternoon.
I find that Cahn had no right to withdraw his offer prior to Vaughan's acceptance. The offer was either irrevocable during the afternoon of February 2, 1990, (C.C. art. 1928) or was accepted within a reasonable time prior to its revocation. (C.C. arts. 1930, 1931).
Accordingly, a binding contract existed between the Cahns and Vaughan and the jury was correct, as a matter of law, in awarding damages for its breach.
WALTZER, Judge, dissenting with written reasons.
I would reverse the judgment.
This is an appeal from a June 23, 1992 judgment of the district court granted in conformity with a jury verdict granting damages in the amount of $30,000.00 to plaintiff Vaughan Contractors, Inc. From that judgment, defendants Jules and Emile Cahn appeal.
The Cahns are the owners of certain land and improvements bearing municipal number 408 Howard Avenue. The premises were leased to Pelican Ice & Cold Storage, Inc., who operated an ice house at that location. On December 24, 1989, the City of New Orleans experienced snow and freezing conditions. On that same night, Pelican Ice suffered a devastating fire.
The City of New Orleans via the Fire Department and the Office of Safety and Permits immediately began to pressure the owners, the Cahns, for immediate demolition of the building. The Fire Department and Safety and Permits both believed that the 40 to 50 foot brick walls which had been left standing were unstable and would collapse onto Howard Avenue, potentially killing both drivers navigating Howard Avenue in their vehicles and homeless pedestrians known to live in the street on Howard Avenue.
The Cahns immediately solicited a number of bids which ranged in price from $70,000 to $40,000. The City indicated that it preferred that the Cahns use Vaughan Construction, who had bid $46,000. After an indication that L & M Demolition and Hauling, Inc. had bid $40,000, Vaughan adjusted its bid to $40,000 and a written contract prepared by Vaughan on his company stationary was signed on Jan. 5, 1990.
At the same time that the City was pressuring the owners to demolish, Alcohol, Tobacco, and Firearms and Pelican's insurer were stalling demolition in order to undertake their own investigations. ATF was investigating for arson, and the insurer was investigating to see if the building and its contents had been overinsured, whether certain insured equipment was in fact on the fire site, and the extent of damage to various equipment.
Mr. Vaughan and his crew helped ATF and the insurer by moving various items at their request. With the intention of salvaging and selling it, Vaughan began removing certain equipment that had been installed by or belonged to Pelican Ice. At that point he and Arthur A. Renaudin, Jr., owner of Pelican Ice engaged in a verbal altercation over the ownership of the equipment. According to testimony by both Jimmy Cahn and Arthur Renaudin of Pelican, originally Pelican was not interested in the fire damaged equipment. Upon further inspection, however, Pelican decided that some of the equipment was useable. Vaughan contended that the equipment belonged to him under the salvage terms of the contract which he had written. Vaughan threatened to intentionally smash good equipment with his wrecking ball in order to make it salvageable scrap. Vaughan pulled his crew off of the job and refused to continue work for 2 days. After some thought and as a good will gesture, Vaughan agreed to relinquish all claim to the Pelican equipment. Renaudin offered to hire Vaughan to remove the equipment for pay, but Vaughan refused. As a result, Renaudin's hired workers began removing the Pelican equipment. According to Mr. Vaughan, the workers were untrained and unskilled in demolition work resulting in their utilization of unsafe techniques and the creation of dangerous conditions. Other testimony indicates that the workers were employees of Boh *1231 Brothers and were experienced in demolition work.
Mr. Vaughan unilaterally issued a written termination letter to the Cahns and Pelican on January 24, 1990, providing as follows:
Please be advised that due to the fact we are not allowed to work and the dangerous and deteriorating condition of the walls and steelwork, our insurance is being removed as of January 24, 1990 as(sic) 12:00 p.m. We cannot assume any liability of any kind on this job. With the insurance adjustment not being completed and a salvage operation about to begin and not being allowed to continue the job, we have no alternative but to terminate our contract and ask payment for the permit in the amount of $158.00, mob/demob of $700.00 plus crane rental on a 108 Linkbelt crane at 42,000.00 per week for one week rental and a 950 Cat loader rental for $700.00. This payment of $3,558.00 is to be for one-half (1/2) of the time we have been on the site. Note* We have a $2,700.00 direct cost per week.
If at a later date you want to demolish this building we will be happy to re-bid this job.
We are notifying the Fire Department and the Department of Permits and Safety of our actions.
If you should have any questions, please feel free to call.
Vaughan testified that he was afraid of being sued as a general contractor for injuries or damage caused by the Pelican-Boh Brothers workers and refused to continue work until they vacated the site. He stopped working and withdrew his crew, although he chose to leave his equipment on the site.
In an attempt to get Vaughan to return to the job, Pelican offered to indemnify Vaughan via the following indemnification letter on January 29, 1990:
Dear Mr. Cahn:
Per our recent conversation, please accept this letter as our indemnification of both you and your demolition contractor against damage to any equipment owned by Pelican Ice and presently remaining in the above referenced building; provided the contractor expends his best efforts to avoid additionally damaging said equipment (listed below); and notifies me immediately when the equipment is available to be removed.
The equipment is as follows:
2 each P34A1 Vogt tube Ice Machines
2 each 100 HP Frick Compressors for the above, with 100 H.P. motors
1 each 5×5 York compressor with motor
1 each 6½ × 6½ York Compressor with motor
1 each 5×5 Frick compressor with motor
1 each 6×6 Frick Compressor with motor Turbo rake and controls
Mr. Cahn, should you have any questions about the above, I will be glad to meet with you and/or your contractor at your convenience.
On January 30, 1990 Jimmy Cahn, son and employee of Jules Cahn faxed the indemnification letter to Vaughan. Vaughan refused to accept the indemnification stating that he did not trust Pelican and that he felt the "best efforts" language in the letter set him up for a lawsuit. Renaudin testified that he put the "best efforts" language into the letter because during their prior dispute over equipment ownership, Vaughan had threatened to reduce good equipment to scrap by intentionally hitting it with his wrecking ball. Vaughan then contacted Cahn and stated that he would return to the job if Cahn paid him standby costs[1] for the leased equipment that Vaughan had unilaterally decided to leave on the site. The demolition contract both prepared and terminated by Vaughan had never provided for "stand-by" payments and the Cahns had never agreed to pay "stand-by" to Vaughan. This was an entirely new demand by Vaughan. Accordingly, the Cahns refused.
At this point the testimony diverges.
Vaughan argues that although the termination letter of January 24 states "we ... terminate our contract" it was not really a termination. He testified that he did not *1232 want to actually terminate the contract, but rather was writing the letter only to mislead his insurance company into believing that he had complied with their requirement that he terminate the contract. He testified that although he wanted the insurance company to believe he had terminated the contract as per their requirement and he did not want the Cahns to believe that he had terminated the contract, he did, however, mail and fax the letter to the Cahns. Although he testified that he did not want the Cahn's to believe the termination letter was a termination, he provided no written refutation to the Cahns and did not attempt to keep the letter from them in any way. Vaughan then further argues that he entered into a second contract, specifically an oral side agreement with Cahn to continue the work under the original contract terms after Pelican was off site. Although Mr. Vaughan had meticulously put everything in writing throughout these transactions, he did not put the second contract in writing or obtain any of the Cahn's signatures thereon. Additionally, there are no witnesses that corroborate Mr. Vaughan's story of the second contract.
In contrast to Mr. Vaughan's story, both Jules and Jimmy Cahn testified that they thought Mr. Vaughan's termination letter terminated the demolition contract. They both testified that they took Vaughan's termination letter to mean what it said, contacted other contractors, rebid the job, and entered into a contract for demolition with L & M, who finished the work. L & M gave the Cahns a $10,000 credit for the work already performed by Vaughan against L & M's original bid price of $40,000 and charged the Cahns' $30,000 plus salvage of non-Pelican equipment to finish the job. The Cahns denied the existence of any second contract or "side agreement" as postulated by Mr. Vaughan and the work proceeded by L & M Contracting. Vaughan was unwilling to accept the situation and broke into the locked site, engaging in a physical and verbal confrontation with the L & M workers. The next day Vaughan again entered the site[2] and was forcibly evicted by the New Orleans Police Department, when Vaughan could not produce a contract indicating that he had the demolition job and L & M did produce a written contract.
Vaughan filed the instant suit seeking damages of $70,000.00, $60,000 lost profits and $10,000 out of pocket costs. At trial, the jury answered the trial court's interrogatories thusly:
1. Was Jules Cahn and Emile Cahn justified in believing the contract was terminated and obtaining another contractor to perform the demolition work?
 YES X 
 NO ___
2. Did Jules Cahn and Emile Cahn breach the contract in such a way as to make them responsible for damages and/or labor, and material to Vaughan Contractors?
 YES X 
 NO ___
If the answer is NO, please sign and return to court.
If the answer is YES, please answer question # 3.
3. Did Vaughan Contractors suffer any damages as a result of a breach of contract by Jules Cahn and Emile Cahn?
 YES X 
 NO ___
If the answer is NO, please sign and return to court.
If the answer is YES, please answer question # 4.
4. What amount of damages and/or labor, and material, if any, in total, would you award to Vaughan Contractors for the breach of contract in this matter?
 $30,000.00
The trial court entered judgment in favor of Vaughan for $30,000.00. The Cahns filed a motion for judgment n.o.v. arguing that the jury interrogatories as answered contain an inherent conflict between questions 1 and 2, such that the trial court should have entered *1233 judgment in favor of the defendants. The trial court denied the motion and defendants appealed.
Counsel makes a great deal of his failure to object to the first jury interrogatory for failing to contain an "If yes do not answer any further" provision. I find this to be of no moment. The jury clearly found that the Cahns were justified in believing that the first contract was terminated in light of Mr. Vaughan's termination letter.
However, I find an error not of fact, but of law in the finding that the Cahns had breached their contract with Vaughan and in assessing damages for the breach.
In order for a breach of contract to have occurred a valid contract had to exist between the Cahns and Vaughan. I agree with the jury's factual finding that the original contract between the Cahns and Vaughan was terminated by Vaughan's actions. Accordingly, Vaughan had to prove the existence of a new, second contract in order to be entitled to a claim for breach of contract damages.
The record is clear that no new written contract was executed. Vaughan's claim is based upon a new verbal contract with the Cahns. Proof of the verbal contract must be in accordance with Civil Code Article 1846 which states:
When a writing is not required by law, a contract not reduced to writing, for a price or, in the absence of a price, for a value not in excess of five hundred dollars may be proved by competent evidence.
If the price or value is in excess of five hundred dollars, the contract must be proved by at least one witness and other corroborating circumstances.
See also: Kibbe v. Lege, 604 So.2d 1366 (La.App.3rd, 1992) writ denied, 606 So.2d 540 (1992).
Other than Vaughan's own testimony there is no other corroborating evidence in the record. Accordingly, I find that the evidence offered by Vaughan was insufficient, as a matter of law, to prove the existence of a verbal contract for the demolition of Cahn's property. Thus, the trial court erred in submitting this issue as a fact issue to the jury and further erred in failing to make this finding as a finding of law, once the jury had returned with its answers to the interrogatories.
Vaughan did, however, perform some work. Normally he would be entitled to quantum meruit, however, he failed to raise it at trial.
For the reasons discussed, I would reverse the trial court judgment on the grounds of error of law.

ON REHEARING
PLOTKIN, Judge.
On rehearing, defendants Jules Cahn and Emile Cahn challenge this court's affirmation of the trial court judgment in favor of plaintiff Vaughan Contractors, Inc., claiming, as they did in their original appellate brief, that the jury's answers to interrogatories were inconsistent and that the trial judge committed legal error in failing to remedy the inconsistent answers.
We disagree with the defendants' major premise in this argument. We find that the answers to the interrogatories are not inconsistent and therefore that the trial judge did not commit legal error in entering judgment on the basis of the jury's findings.
Certainly the language of the interrogatories in this case was not confusing. Further, there is no reason to believe that the jury did not understand the questions. Nevertheless, in its answer to the first interrogatory, the jury found that the defendants were justified in believing that the original contract with Vaughan had been terminated and thus in obtaining another contractor to perform the demolition work. The defendants suggest that the affirmative answer to that question should be considered to decide the case in their favor and urge us to simply reverse the trial court judgment on the basis of the answer to the first interrogatory.
However, adopting the defendants' arguments on this issue would require us to completely ignore the jury's answers to the other questions submitted by the trial judge. We are not willing to do so, especially in light of *1234 the circumstances presented by this case. Under the facts presented by this case, the jury's decision that the original contract was terminated by the letter Mr. Vaughan wrote to Jules Cahn does not decide the case. The jury then had to consider Vaughan Contractors' primary argument that the defendants either entered a new contract or "reactivated" the original contract through Jules Cahn's subsequent discussions with Mr. Vaughan. The jury's answer to the second interrogatory indicates that it found that a second contract was confected and that that second contract was breached, resulting in damages to Vaughan Contractors.
Thus, the jury's decision to answer "yes" to the first question, but "no" to the second question was reasonable and perfectly consistent under the circumstances of the case. The trial judge did not commit legal error in entering judgment on the basis of the jury's answers to the arguments. The defendants' application for rehearing is therefore denied.
NOTES
[1] Vaughan leases his equipment from an alter-ego equipment corporation which he also owns.
[2] Vaughan testified that the site was unlocked when he arrived; the Cahns testified that the lock had been broken.