# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 15-372


THALIA RENFRO

VERSUS

**BURLINGTON NORTHERN SANTA FE RAILWAY COMPANY, ET AL.**



\*\*\*\*\*\*\*\*\*\*


APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2002-0506
HONORABLE DAVID ALEXANDER RITCHIE, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## DAVID KENT SAVOIE
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Ulysses Gene Thibodeaux, Chief Judge, John D. Saunders, James T. Genovese, Shannon J. Gremillion, and David Kent Savoie, Judges.

**THIBODEAUX, Chief Judge, dissents in part and assigns written reasons.**

**SAUNDERS, J., dissents in part for the reasons assigned by Chief Judge Thibodeaux.**

**AFFIRMED.**

**John F. Wilkes, III**
**Ray Lucus, III**
**Borne & Wilkes, LLC**
**P. O. Box 4305**
**Lafayette, LA 70502-4305**
**(337) 232-1604**
**COUNSEL FOR DEFENDANT/APPELLEE:**
     **Town of Vinton**

**Lawrence N. Curtis**
**Lawrence N. Curtis, Ltd.**
**P. O. Box 80247**
**Lafayette, LA 70598-0247**
**(337) 235-1825**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
     **Thalia Renfro**

**Adam L. Ortego, Jr.**
**Assistant Attorney General**
**One Lakeshore Dr., Suite 1200**
**Lake Charles, LA 70629**
**(337) 491-2880**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **State of Louisiana, Department of Transportation and Development**

**SAVOIE, J.**

This suit arises out of an accident in which a train struck a vehicle attempting to cross the railroad tracks. The seventeen-year-old driver and sole occupant of the vehicle was killed in the crash. The jury returned a verdict in favor of the decedent's mother, Thalia Renfro ("Ms. Renfro"), and against the State of Louisiana, through the Department of Transportation and Development ("DOTD"). Both DOTD and Ms. Renfro have appealed. For the following reasons, we affirm the trial court's judgment.

## FACTS AND PROCEDURAL HISTORY

On November 4, 2001, a tragic vehicle/train accident took place at the Eddy Street railroad crossing in Vinton, Louisiana. A train was headed eastbound, and seventeen-year-old Mallory Young ("Mallory") was driving her mother's 2000 Mercury Mountaineer southbound on Eddy Street. The train collided with Mallory's vehicle as she attempted to cross over the railroad tracks, and Mallory did not survive the accident.

Eddy Street is a municipal street owned by the Town of Vinton ("The Town"). The Eddy Street crossing where the accident occurred is an off-system crossing in that it is not part of the state highway system.

Prior to 1996, the Eddy Street crossing was controlled by an active warning device[1] called a "wig wag," which was a flashing light signal that warned motorists when a train was approaching the intersection. In 1996, the Eddy Street crossing was closed in connection with an upgrade to another nearby crossing. According to DOTD, the closing was the result of a miscommunication between DOTD and the Town wherein DOTD erroneously concluded that the Town had agreed to the closing. The crossing was subsequently reopened in 1997; however, only passive

---

[1]An active warning device employs flashing lights, bells, and/or closing gates.

warning devices[2] were put into place, including an advanced warning sign, an X-shaped sign known as "crossbucks," pavement markings, and a stop sign.

Mallory's mother, Ms. Renfro, filed suit against multiple defendants, including DOTD, the Town, Burlington Northern Santa Fe Railroad Company/Union Pacific Railroad Company ("Railroad"), and Calcasieu Parish. At the time of trial, only DOTD and the Town remained as Defendants.

A trial on the merits was held on January 27, 2014. Primarily at issue was whether, and to what extent, DOTD and/or the Town were negligent in connection with the installation of passive, rather than active, warning signals when the crossing was reopened in 1997. The case against the DOTD was tried before a jury, and the case against the Town was simultaneously tried before the trial court judge based on evidence submitted in connection with the jury trial. Even though the trial judge was to determine the case against the Town, the parties agreed to conduct the jury trial as if liability of both the Town and DOTD were at issue.

The jury assessed fault as follows: Mallory (32%); the Railroad (31%); DOTD (29%); and the Town (8%). The jury also found that general damages in the following amounts would compensate Ms. Renfro: $1,320,000 for "grief and sorrow;" $1,320,000 for "mental anguish;" and $3,960,000 for "loss of love, affection, and companionship." The jury also awarded Mallory's medical and funeral expenses, as well as Ms. Renfro's medical expenses.

In connection with the bench trial against the Town, the trial judge found no fault on the part of the Town and dismissed Ms. Renfro's claims against it. In its written reasons for ruling, the trial judge noted that it had previously granted partial summary judgment in favor of the Town, finding that the Town had

---

[2]Passive warning devices are signs that warn motorists that they are approaching a railroad crossing, but do not warn motorists that a train is approaching.

discretionary immunity for asking that the crossing be reopened after it was closed by DOTD. The trial judge found that the Town "had no control over what signalization was placed at the Eddy Street crossing," and that "the Town of Vinton's placement of the stop sign at the crossing was performed in accordance with guidelines and instructions from the DOTD."

Ultimately, the trial judge rendered judgment in favor of Ms. Renfro and against DOTD, assessing DOTD with twenty-nine percent of the damages awarded, but reducing DOTD's liability for general damages to $500,000 pursuant to the statutory cap provided by La.R.S. 13:5106. The trial judge also assessed DOTD with all court costs in the amount of $46,600.11. Both DOTD and Ms. Renfro appeal.

## ASSIGNMENTS OF ERROR

On appeal, DOTD asserts the following as assignments of error:

1. The trial jury erred in apportioning twenty-nine percent (29%) fault to the DOTD and failing to apportion more fault to Ms. Mallory Young and the Railroad.

2. The trial judge erred in providing the jury with a verdict form which duplicated damages.

3. The trial jury erred in awarding $6,600,000 in general damages.

4. The trial judge erred in refusing to admit evidence of federal preemption and in not finding that federal preemption applied in this case.

5. The trial judge erred in failing to determine whether the DOTD assumed a duty in this case.

6. The trial judge erred in his instructions to the jury.

7. The trial judge erred in permitting the unlimited introduction of 23 U.S.C. Section 409 materials.

8. The trial judge erred in assessing all costs to DOTD.

In her answer to the appeal, Ms. Renfro asserts that the trial court erred in limiting the general damages awarded against the DOTD to one statutory cap, rather than allowing two separate $500,000 statutory caps–one for a wrongful death claim under La.Civ.Code. art. 2315.2, and one for a bystander claim under La.Civ.Code art. 2315.6.

## ANALYSIS

### Federal Preemption:

DOTD contends that the trial court erred in not finding that Ms. Renfro's negligence claims were preempted by federal law. In support of its argument, DOTD suggests that the testimony of William Shrewsberry, as well as two proffered affidavits not admitted into evidence by the trial court, established that federal funds were used in connection with reopening the Eddy Street crossing.

DOTD cites to *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 113 S.Ct. 1732 (1993), "that states where 'federal aid funds participated in the installation of the [warning] devices' at the crossing, federal law preempts state law[.]" *Duncan*, 773 So.2d at 678 (citation omitted). Mere demonstration that federal funds were used at a particular crossing is insufficient to establish federal preemption of state tort law. *Ducote v. Union Pac. R.R. Co.*, 08-1208 (La.App. 3 Cir. 2/4/09), 4 So.3d 240, *writ denied*, 09-940 (La. 6/5/09), 9 So.3d 877. "Rather, the railway company must present evidence that would lead to an 'unequivocal conclusion that the signage' at a particular crossing was installed or replaced with federal moneys." *Id.* at 245 (citation omitted). The trial court's factual findings are subject to the manifest error standard of review. *See Duncan v. Kan. City S. Ry. Co.*, 00-66, (La. 10/30/00), 773 So.2d 670.

We first address the proffered affidavits, which the trial court refused to admit on the basis that they were inadmissible hearsay. As this court explained in

*Young v. Joy*, 09-756, p. 2 (La.App. 3 Cir. 2/3/10), 30 So.3d 1116, 1119 (citation omitted), "[t]he district court is awarded vast discretion in its decisions on evidentiary rulings, and its decision to admit or exclude evidence will not be reversed on appeal absent a clear showing of abuse of that discretion."

"'Hearsay' is a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted." La.Code Evid. art. 801(C). Generally, hearsay is not admissible at trial. La.Code Evid. art. 802. However, several exceptions to this general rule exist, including an exception provided by La.Code Evid. art. 803(6), for:

> Records of regularly conducted business activity. A memorandum, report, record, or data compilation, . . . if made and kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make and to keep the memorandum, report, record, or data compilation . . . . This exception is inapplicable unless the recorded information was furnished to the business either by a person who was routinely acting for the business in reporting the information or in circumstances under which the statement would not be excluded by the hearsay rule.

When questioned by the trial judge concerning the affidavits, counsel for DOTD stated that he "got [the affidavits] from the attorneys for the railroad[,]" and that "it was done for the purpose of this case[,] and they are the originals[,] and the witnesses say that they are in the business records of the railroad." Therefore, the affidavits at issue were not "made and kept in the course of a regularly conducted business activity[,]" and it was not "the regular practice of that business activity to make and to keep" such affidavits. Instead, the affidavits were prepared specifically for trial. The trial judge did not abuse his discretion in refusing to admit them into evidence.

DOTD also suggests that William Shrewsberry's testimony requires a finding that Ms. Renfro's claims are preempted. DOTD does not refer to any

5

specific testimony in support of its argument, and it does not mention in its brief, or otherwise raise as an issue on appeal, that the trial judge "order[ed] that the answers given by. . . [Shrewsberry] related to federal funding be stricken from the record." The trial court's ruling was based on the fact that Mr. Shrewsberry's testimony is "an opinion from a lay witness based on a review of hearsay." Because this ruling was not challenged on appeal, we are not inclined to review it.

We find no evidence in the record regarding federal preemption besides the purported affidavits, which were not admitted, and the testimony of Mr. Shrewsberry, which was stricken. Therefore, the trial court's decision rejecting DOTD's federal preemption claim is supported by the record and was not manifestly erroneous.

## Jury Determination of Assumption of Duty:

DOTD contends that the trial judge, and not the jury, should have decided the issue of whether the DOTD had assumed a duty over the off-system Eddy Street crossing. DOTD asserts that "whether [it] assumed a duty or not is a legal question[,]" and, therefore, the issue is subject to a de novo standard of review. For the following reasons, we find this assignment of error lacks merit.

"[W]hether a duty is owed is a question of law for the court to decide based upon the facts and circumstances of the case as established in the evidence of record." *Hebert v. Rapides Parish Police Jury*, 06-2001, 06-2164, p. 8 (La. 4/11/07), 974 So.2d 635, 643 (citation omitted). A governing authority has a duty to keep roads in its custody in a reasonably safe condition, including a duty to use appropriate signage and traffic signals. *Lee v. State, Through Dep't of Transp. & Dev.*, 97-350 (La. 10/21/97), 701 So.2d 676. "Generally, the state does not have a duty to provide protection devices at railroad crossings on non-state, or off-system,

roads." *Bader v. Kan. City S. Ry. Co.*, 36,536, p. 3 (La.App. 2 Cir. 12/20/02), 834 So.2d 1, 3 (citation omitted).

> [However,] [u]nder Louisiana law, one who does not owe a duty to act may assume such a duty by acting. Frank L. Maraist & Thomas C. Galligan, *Louisiana Tort Law* 5.07[6], 5-27 (Supp.2006). In *Bujol v. Entergy Services, Inc.*, 03-0492, p. 16 (La. 5/25/04), 922 So.2d 1113, 1129, this Court explained this concept of assumption of duty and stated an assumption of duty arises when the defendant (1) undertakes to render services, (2) to another, (3) which the defendant should recognize as necessary for the protection of a third person. . . .
>
> The *Bujol* court described the action required by the defendant in such instances as an affirmative undertaking and further explained that the determination of whether such an action was taken involves an examination of the scope of the defendant's involvement, the extent of the defendant's authority, and the underlying intent of the defendant. 03-0492 at p. 18, 922 So.2d at 1131. As in other civil cases, the <u>burden is on the plaintiff to prove by a preponderance of the evidence facts sufficient to establish the action undertaken by the defendant.</u>

*Hebert*, 974 So.2d at 643-644 (emphasis added).

In a previous opinion involving this matter, we reversed the trial court's summary judgment in favor of DOTD on the issue of whether it owed a duty with respect to the Eddy Street crossing, finding an issue of material fact existed, and we remanded the matter for a factual determination. *Renfro v. Burlington N. & Santa Fe R.R.*, 06-952 (La.App. 3 Cir. 12/6/06), 945 So.2d 857, *writ denied*, 07-303 (La. 4/27/07), 955 So.2d 684. In that case, we stated:

> DOTD was more involved with the Eddy Street crossing than merely selecting it for an upgrade. Correspondence between the parties indicates that the DOTD was involved in many decisions regarding the closure and subsequent reopening of the Eddy Street crossing.
>
> We find that there is a question of material fact as to whether the DOTD had a duty regarding the Eddy Street crossing.

*Id.* at 861.

As made clear by the above-cited jurisprudence and our previous opinion in this matter, the question concerning whether DOTD assumed a duty to keep the

Eddy Street crossing in a reasonably safe condition and install proper signalization required a factual determination by the jury and not a legal conclusion by the trial court judge. Therefore, we find that the issue of whether the DOTD assumed a duty in the instant case was properly submitted to the jury, and we decline to conduct a de novo review of the issue. We further note that the DOTD does not contend that the jury's finding was manifestly erroneous, therefore, that issue is not before us for review.

**Jury Instructions**:

DOTD also takes issue with two of the trial court's jury instructions regarding the applicable duties in this case. As to the issue of DOTD's assumption of duty, the trial court instructed the jury as follows (emphasis added):

> [A] duty to maintain a road or highway in a reasonably safe condition may be imposed on a public entity, even though it does not own the road or highway if it is found to be the custodian. This duty includes a duty of providing proper safeguards or adequate warning of dangerous conditions on a road or highway. *This duty is owed to prudent, as well as momentarily inattentive drivers*.

DOTD argues that the last sentence regarding momentarily inattentive drivers is erroneous because it "borrows from the duty applicable in defective shoulder cases" and cannot apply to railroad cases because railroads are inherently dangerous.

DOTD also argues that the following jury instruction erroneously uses the word "could" instead of "should" (emphasis added):

> If a motorist fails to see what she *could* have seen, then the law charges her with having seen what she *could* have seen, and the court examines her subsequent conduct on the premise that she did see what she could have seen.

A trial court has broad discretion in formulating jury instructions. *Adams v. Rhodia, Inc.*, 07-2110 (La. 5/21/08), 983 So.2d 798. The adequacy of any one jury instruction is determined in the light of the instructions as a whole. *Id.* As this

court has explained in *Mathews v. Dousay*, 96-858, p. 8 (La.App. 3 Cir. 1/15/97), 689 So.2d 503, 509-10:

> The trial court must give jury instructions that properly reflect the law applicable to the facts of the particular case. *Brown v. Diamond Shamrock, Inc.*, 95-1172 (La.App. 3 Cir. 3/20/96); 671 So.2d 1049. To fulfill this duty, the trial court must both insure that the jury considers the correct law and, in giving the instructions, avoid confusing the jury. *Id.* In *Iorio v. Grossie*, 94-846, pp. 2-3 (La.App. 3 Cir. 10/4/95); 663 So.2d 366, 368–69, this court stated:
>
>> A trial court should give all requested instructions that correctly state the law, provided that they are material and relevant to the litigation. . . . A court has fulfilled its duty if its instructions fairly and reasonably point out the issues presented by the pleadings and evidence and provide the principles of law necessary to resolve those issues.
>>
>> An appellate court must exercise great restraint before overturning a jury verdict on the basis of erroneous instructions. Consequently, we will overturn the jury's verdict in the case *sub judice* on the basis of such an error only if the instructions, taken as a whole, were so incorrect or inadequate as to preclude the jury from reaching a verdict based on the relevant law and facts. Ultimately, the pertinent inquiry is whether the jury was misled to such an extent as to be prevented from doing justice.

The trial court's instruction that a public entity's duty to maintain a road or highway in a reasonably safe condition is owed to "prudent, as well as momentarily inattentive drivers" is a correct statement of the law. Contrary to the assertion of DOTD, the duty to "momentarily inattentive drivers" applies outside the context of defective shoulder cases. *See Ferrouillet v. State ex rel. Dep't of Transp. & Dev.*, 02-576 (La.App. 4 Cir. 1/15/03), 836 So.2d 686, *writs denied*, 03-751, 03-756 (La. 5/9/03), 843 So.2d 402, 403. Additionally, the duty has been applied in the context of conditions considered to be "extremely dangerous," much like a railroad crossing. *Trahan v. State, Dep't. of Transp. & Dev.*, 536 So.2d 1269, 1273 (La. App. 3 Cir. 1988), *writ denied*, 541 So.2d 854 (La.1989).

9

We also find ample support in the jurisprudence for use of the word "could," instead of "should," in connection with the second jury instruction at issue on appeal. *See Wilkerson v. Kan. City S. Ry.*, 33,922 (La.App. 2 Cir. 11/1/00), 772 So.2d 268, *writ denied*, 00-3526 (La. 2/16/01), 786 So.2d 105; *Glisson v. Mo. Pac. R.R. Co.*, 158 So.2d 875 (La. App. 3 Cir. 1963), *aff'd*, 165 So.2d 289 (La.1964).

Therefore, upon review of the jury instructions as a whole and in light of the facts and pleadings in this case, we find that the instructions given by the trial court "fairly and reasonably point out the issues presented by the pleadings and evidence" and allowed the jury to reach a verdict based on the relevant law and facts. *Iorio*, 663 So.2d at 368. Thus, we conclude the trial court did not err in its instructions.

**Admission of Materials Subject to 23 U.S.C. § 409 Privilege**

DOTD also suggests on appeal that it was improper for the trial court to allow the unlimited introduction of documentation protected from discovery under 23 U.S.C. § 409 as evidence pertaining to DOTD's assumed duty over the Eddy Street crossing. DOTD asks us to reconsider our prior ruling in *Renfro*, 945 So.2d 857, wherein we held that DOTD had waived any privilege afforded by 23 U.S.C. §409 by attaching otherwise privileged documents to a motion for summary judgment claiming federal law preempted Ms. Renfro's claims. Ms. Renfro attached those same documents to her motion for summary judgment on the issue of the DOTD's duty. DOTD thereafter moved to withdraw its motion and the documents attached to it and sought to preclude Ms. Renfro from relying on the documents.

In resolving the issue, we explained:

> We see no compelling reason that the State cannot waive the privilege afforded it by Section 409. Section 409 merely affords the State a disclosure and evidentiary privilege regarding certain materials.

The United States Supreme Court has recognized that Section 409 establishes a privilege. As stated in *Pierce County, Washington v. Guillen*, 537 U.S. 129, 130, 123 S.Ct. 720, 723, 154 L.Ed.2d 610 (2003), "[e]videntiary privileges, such as § 409, must be construed narrowly because they impede the search for truth." In *United States v. Mezzanatto*, 513 U.S. 196, 115 S.Ct. 797, 130 L.Ed.2d 697 (1995), the Supreme Court recognized that statutory provisions are subject to waiver absent an affirmative indication in the statute of Congress' intent to preclude waiver. There is nothing in Section 409 that prevents the State from waiving the statutory privilege it has been granted. As noted by the court in *Powers v. CSX Transportation, Inc.*, 177 F.Supp.2d 1276, 1281 (S.D.Ala.7/16/01): "A primary attribute of a privilege is that it may be waived by the party for whose benefit it exists, and waiver is often found when that party has voluntarily disclosed protected information."

Therefore, we find that the discovery and evidentiary privilege established by Section 409 can be waived by the party entitled to assert the privilege. In the present case, the DOTD chose to admit documents which it claims are privileged into evidence with its motion for summary judgment. Once the DOTD put the documents in evidence, it waived the privilege regarding those documents. *Once it waived the privilege, the information in the documents was no longer privileged.*

*Renfro*, 945 So.2d at 860 (emphasis added).

We find no reason to reconsider our prior ruling in this matter. Therefore, we find that the trial court did not err in permitting the introduction of materials previously protected by the privilege of 23 U.S.C. § 409.

**Allocation of Fault**:

We next consider DOTD's argument that the jury erred in assessing it with twenty-nine percent of the fault. DOTD contends that the jury erred by assigning it any fault at all, arguing that the warning devices were in compliance with the then-applicable version of the Federal Highway Administration's Manual on Uniform Traffic Control Devices for Streets and Highways (MUTCD).

Alternatively, DOTD argues that more fault should have been assessed to Mallory because the accident was primarily caused by her failure to yield the right-of-way to the train in breach of her duty under La.R.S. 32:171. DOTD suggests

11

that Mallory failed to compensate for a sun glare that may have prevented her from seeing the train while she was stopped at the railroad crossing and she negligently proceeded into the path of the oncoming train. In addition, DOTD argues that the Railroad should have been assigned with a higher percentage of fault as it failed to sound its horn.

The Louisiana Supreme Court set forth the applicable standard of review in *Duncan*, 773 So.2d at 680 (citations omitted) as follows:

> As with other factual determinations, the trier of fact is vested with much discretion in its allocation of fault. Therefore, an appellate court should only disturb the trier of fact's allocation of fault when it is clearly wrong or manifestly erroneous. Only after making a determination that the trier of fact's apportionment of fault is clearly wrong can an appellate court disturb the award, and then only to the extent of lowering it or raising it to the highest or lowest point respectively which is reasonably within the trial court's discretion.
>
> The appellate courts['] determination of whether the trial court was clearly wrong in its allocation of fault is guided by the factors set forth in *Watson v. State Farm Fire and Cas. Ins. Co.*, 469 So.2d 967, 974 (La.1985). In *Watson*, we said "various factors may influence the degree of fault assigned, including:
>
>> (1) [W]hether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.["]

Where there is a duty, a public entity will be liable for accidents occurring on railroad crossings when: "(1) the crossing was unreasonably dangerous; (2) the governing authority had knowledge of the condition yet failed to exercise a reasonable chance to remedy that condition; and (3) that the unreasonably

dangerous condition caused the accident." *Plank v. Town of Rayville*, 33,476, pp.

10-11 (La.App. 2 Cir. 6/21/00), 764 So.2d 1194, 1201 (citation omitted).

> The hallmark for determining whether a crossing is unreasonably dangerous is whether it is maintained in a reasonably safe condition for persons exercising ordinary care and prudence. *Highlands Ins. Co. v. Missouri Pacific Railroad Co.*, 532 So.2d 317 (La.App. 3d Cir.1988); *Hebert v. Missouri Railroad Co.*, 366 So.2d 608 (La.App. 3d Cir.1978), *writ denied*, 369 So.2d 153 (La.1979). There are a myriad of conditions which may contribute to the unreasonably dangerous condition of a railroad crossing including, but certainly not limited to, sight obstructions such as vegetation and buildings, parallel roadways and inadequate warning devices or signalization. Every railroad crossing has its own particular dynamics which may include one or more hazards. The presence of such hazards does not, however, automatically mean, in the legal sense, that a certain crossing is unreasonably dangerous to motorists exercising ordinary care and prudence.

*Id.* at 1201-02.

As our brethren in the fourth circuit explained in *Clarkston v. La. Farm Bureau Cas. Ins. Co.*, 07-158, 07-1282, p. 27 (La.App. 4 Cir. 7/2/08), 989 So.2d 164, 184, *writ denied*, 08-1768 (La. 10/31/08), 994 So.2d 539 (emphasis added):

> To properly execute its duties, the DOTD is guided by the *Manual on Uniform Traffic Control Devices* ("MUTCD"), which sets forth the *minimum* standards of the DOTD in the construction and maintenance of its roads and highways. Compliance with the provisions of the MUTCD, which is mandated by law, is prima facie proof of the DOTD's absence of fault when an injured motorist or pedestrian attempts to predicate the DOTD's liability on improper maintenance. [*Huddleston v. Ronald Adams Contractor, Inc.*, 95-987 (La. 2/23/96), 671 So.2d 533.] When there is evidence of noncompliance, it is not in and of itself indicative of liability. Rather, it is a relevant factor in determining the ultimate issue of whether the roadway was unreasonably dangerous.

The DOTD's duty must be considered in light of the duty of motorists approaching a crossing. Louisiana Revised Statutes 32:171(A) imposes a duty on motorists to stop at railroad crossings in certain circumstances, and after stopping, the driver "shall not proceed until he can do so safely." As explained in *LeJeune v. Union Pac. R.R.*, 97-1843, p. 6 (La. 4/14/98), 712 So.2d 491, 494:

13

> As a general rule, motorists approaching a railroad crossing must look and listen for possible oncoming trains before traversing the crossing. *Glisson v. Missouri Pac. R.R. Co.*, 246 La. 470, 476, 165 So.2d 289, 291 (1964). The law does not require motorists to stop at every railroad crossing, but "a driver cannot expect to drive with impunity through a railroad crossing where his view is obstructed." *Rivere v. Union Pac. R.R. Co.*, 93-1132, p. 9 (La.App. 1st Cir. 10/07/94), 647 So.2d 1140, 1147. Instead, motorists must keep their vehicles "under such control as to be able to stop immediately" upon spotting an oncoming train. *Hebert v. Missouri Pac. R.R. Co.*, 366 So.2d 608, 614 (La.App. 3d Cir.1978) (quoting *Bertrand v. Missouri Pac. R.R. Co.*, 160 So.2d 19, 23 (La.App. 3d Cir.1964)). Moreover, if a motorist's view is obstructed, he must exercise a higher degree of caution. *Glisson*, 246 La. at 477, 165 So.2d at 291.

After reviewing the record, we find ample evidence to support the jury's finding of fault on the part of the DOTD, as well as its allocation of fault among DOTD, Mallory, and the Railroad.

The accident at issue was witnessed by occupants of a truck that had crossed the tracks immediately before Mallory attempted to cross. Willie Ray Patin was driving the truck, and his wife, Paula Cart Patin, was a passenger in the truck. In addition, Daniel McGrath and Judy McGrath were riding in the bed of Mr. Patin's truck at the time. These witnesses each testified that they did not see the train coming until they were crossing over the tracks because of a glare from the sun, that the train was travelling at a high rate of speed, and that they did not hear the train sound a horn until after it hit Mallory's vehicle. The McGraths also testified that they saw Mallory stop and look both ways before proceeding into the path of the train. There was no evidence suggesting that Mallory attempted to block the sun with her hand or visor to contend with the blinding sun glare or conditions at the crossing.

Therefore, the evidence does support a conclusion that Mallory breached her duty and that the breach bore a causative relationship to the accident at issue.

14

Moreover, there was evidence to support a breach of duty on the part of the Railroad by failing to sound its horn.

However, this conclusion does not preclude a finding that DOTD's conduct was also in breach of its duty or a proximate cause of the accident. Mr. Archie Burnham, a traffic engineer and expert in railroad crossing design and safety, testified that the Eddy Street crossing was unreasonably dangerous for several different reasons, summarizing his opinions as follows:

> Well I mentioned to you I had one opinion that [the railroad crossing] was an extra hazardous crossing. I have five supports for that and I think we've covered the supports. Just to be brief, they were number one, that the federal law 646.214(b)(3) required bells, lights, and gates for these conditions that existed here. Two, that the crossing should never have been reopened with passive signs unless they were properly placed. My concern was not so much with the signs, but with where they were, and secondly - - or thirdly, that the physical properties of the crossing made it more difficult for the motorist. They had more to look for than is a train coming. They had to deal with an odd angle. Most crossings are 90 degrees, this one is 58. Most of them have surface crossings that are smooth, this one was rough and humped. This one had protection devices that were ineffective, inoperative. Passive signs were located too far from the near rail and the position of the sun produced glare. Those were extra factors that the motorist had to deal with. Fourthly, that the train speeds had been increased significantly the year of this accident and made it harder for the motorist to make a judgment with respect to when the train was going to be at the crossing, and fifthly, that the crossing when it was reopened in 1997 to the public was downgraded with undesirable construction, removal of electric signals and operational factors, including the effect in the operation at the crossing. Those were my five supports for the fact this is an ultra[-]hazardous crossing.

DOTD suggests that it bears no fault in this accident because the passive warning signals were in compliance with the then-applicable version of the MUTCD, and that Mr. Burnham's testimony to the contrary was based on a later version. However, even assuming the DOTD was in fact in compliance with the then-applicable version of the MUTCD, such compliance is merely prima facie evidence that DOTD was not negligent in the instant matter. *Clarkston*, 989 So.2d

164. "*Prima facie* proof is sufficient only if not rebutted or contradicted." *Skulich v. Fuller*, 46,733, p. 5 (La.App. 2 Cir. 12/14/11), 82 So.3d 467, 471 (citation omitted).

Mr. Burnham testified that multiple out-of-the-ordinary conditions at the crossing such as the unusual angle of the track, the surface conditions of the crossing, the blinding sun glare, and the increased speed of trains, were difficulties with which motorists had to contend at this particular crossing and made this crossing extremely dangerous. This testimony reasonably supports a finding that mere compliance with the MUTCD was insufficient to discharge the DOTD's duty in connection with this particular crossing. Therefore, the jury was not manifestly erroneous in assessing fault to the DOTD.

The jury allocated the highest percentage of fault in this case to Mallory (32%), and it allocated the next highest percentage of fault to the Railroad (31%). With the exception of the Town, who was allocated no fault by the trial judge, the DOTD was assigned with the lowest percentage of fault in this case (29%). Given the applicable legal principles and discretion given to the jury in connection with the testimony and evidence presented, we cannot say that the percentages of fault the jury assigned are manifestly erroneous.

**Bystander Claim and Statutory Cap on Damages**

We next consider Ms. Renfro's answer to the appeal wherein she asserts that the trial court erred "in holding that . . . [her] jury award of general damages . . . should be reduced -- to the general damage statutory cap -- $500,000 -- imposed by La. R.S. 13:5106[.]" Relying on *Lockett v. State, Dept. of Transp. & Dev.*, 03-1767 (La. 2/25/04), 869 So.2d 87, Ms. Renfro argues that the version of La.R.S. 13:5106 applicable to the instant case had been deemed ambiguous, and therefore two separate $500,000 general damage caps are permitted; "namely, one general

16

damage cap in the wrongful death claim under [La.Civ.Code] [a]rt[.] 2315.[2] and the second general damage cap in the . . . [bystander] claim under [La.Civ.Code] [a]rt[.] 2315.[6.]" However, Ms. Renfro's argument incorrectly assumes that a bystander claim was properly submitted to the jury or otherwise awarded by the trial court.

Louisiana Civil Code Article 2315.6(A) provides, *inter alia*, that the mother of an injured person, "who view[s] an event causing injury to [the injured] person, or who come[s] upon the scene of the event soon thereafter, may recover damages for mental anguish or emotional distress that they suffer as a result of the other person's injury[.]"

> To recover for mental anguish or emotional distress under this Article, the injured person must suffer such harm that one can reasonably expect a person in the claimant's position to suffer serious mental anguish or emotional distress from the experience, and the claimant's mental anguish or emotional distress must be severe, debilitating, and foreseeable. Damages suffered as a result of mental anguish or emotional distress for injury to another shall be recovered only in accordance with this Article.

La.Civ.Code art. 2315.6(B).

Ms. Renfro's petition in this matter lacks any factual allegations sufficient to establish a bystander claim under La.Civ.Code art. 2315.6. Moreover, a thorough review of the jury instructions, opening and closing statements, and jury verdict form makes clear that Ms. Renfro failed to ask the jury to determine any facts necessary for a bystander claim under La.Civ.Code. art. 2315.6. Ms. Renfro did not object to the jury verdict form or jury instructions, or otherwise specifically ask the trial court to award damages for a bystander claim.

We do note, however, that there was testimony presented regarding Ms. Renfro coming upon the scene. Ms. Renfro testified that she received a phone call from Mallory's friend informing her of the accident, and then she later went to the

scene. She testified that, once she arrived at the scene, she did not remember seeing the vehicle and that she was not permitted to see Mallory. Ms. Renfro stated that she did not see Mallory's body until she was at the funeral home. In addition, Raven Gradnigo, who is Mallory's sister and Ms. Renfro's daughter, testified that she, along with her aunt and Ms. Renfro, went to the scene of the accident and that when they got there, Ms. Renfro "passed out."

Moreover, Ms. Renfro's counselor, Lee Franks, testified as to the emotional distress Ms. Renfro suffered from having learned of Mallory's death, rushing to the scene, and then being prevented from hugging Mallory at the scene.

While this testimony may be relevant to a bystander claim, or a defense thereto, La.Code Civ.P. art. 1812(A) states (emphasis added):

> The court may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact. . . . *If the court omits any issue of fact raised by the pleadings or by the evidence, each party waives his right to a trial by jury of the issue omitted* unless, before the jury retires, he demands its submission to the jury. *As to an issue omitted without such demand the court may make a finding, or if it fails to do so, it shall be presumed to have made a finding in accord with the judgment on the special verdict.*

Therefore, under La.Code Civ.P. art. 1812, Ms. Renfro is deemed to have waived a jury trial on facts necessary for a bystander claim, since the jury verdict form is silent on the issue. Therefore, we are required to assume that the trial court denied the bystander claim on the evidence presented as there is no indication to the contrary in the trial court's judgment.

While there are three separate categories of general damages on the jury verdict form,[3] we are not inclined to assume that any of the specific categories

---

[3] The jury verdict form contained separate categories of general damages for "grief and sorrow", "mental anguish," and "loss of love and affection." DOTD suggests on appeal that it was improper to separate "grief and sorrow" and "mental anguish" into two items of general damages. It is noteworthy that in response, Ms. Renfro does not argue that either of these categories were meant to compensate her for a separate bystander claim.

18

were meant to compensate Ms. Renfro solely for damages related to a bystander claim, which this court has recognized are separate and distinct from those awardable for a wrongful death claim. *Castille v. La. Med. Mut. Ins. Co.*, 14-519 (La.App. 3 Cir. 11/5/14), 150 So.3d 614.[4]

The jury instructions discuss only a claim for damages resulting from Mallory's death, and there is no indication that any of the specific categories of general damages were meant to compensate Ms. Renfro solely for a bystander claim.[5]  Additionally, there is no indication in the final judgment that any of the

---

[4] In *Castille*, we noted that a "wrongful death action arises when the victim dies[,]" and "compensates the beneficiaries for their own damages suffered from the moment of the direct victim's death and thereafter[,]" whereas a bystander claim "arises when a person observes an injury-causing event or soon after comes upon the scene of an injury and is contemporaneously aware that the event has caused severe harm to the direct victim" and "compensates the bystander for the immediate shock of witnessing a traumatic event which caused the direct victim severe and apparent harm."  150 So.3d at 618-19.

[5]The following jury instructions were provided (emphasis added):

In an action such as this one, Louisiana law permits a plaintiff as the surviving beneficiary of the deceased to present evidence of the loss which she has suffered as a result of the death and for which you may award damages to her.

This is a suit by the plaintiff, Thalia Renfro, seeking damages for the death of her daughter, Mallory Young.  The plaintiff contends that Mallory's death was caused by the acts or the failure to act on the part of the DOTD, or the Town of Vinton, or both.
. . . .

Therefore, you must now decide the question of whether there has been damage [to] the plaintiff's person or property, and if so, the amount of that damage.
. . . .

The law recognizes both general damages which the plaintiff may have faced because of the incident, and specific damages sometimes called special damages . . . .

If you decide to award the plaintiff general damages, you may consider her grief, loss of love and affection and companionship, both in the past and to be anticipated in the future.
. . . .

The law recognizes that a Plaintiff may suffer mental distress and anguish as a result of an incident.  You are permitted to consider such consequences as a part of the general damages which you may award.

The next item that Thalia Renfro may be entitled to recover in the form of money is the loss suffered by her of the love, affection, companionship, society,

19

damages awarded were specifically meant to compensate Ms. Renfro for a bystander claim, or that the trial court found that Ms. Renfro had proven her entitlement to a bystander claim. Moreover, there is no indication that Ms. Renfro even asked the trial court to find or award damages for a bystander claim. Therefore, we have no basis upon which to conclude that Ms. Renfro was awarded damages for a bystander claim.

On appeal, Ms. Renfro asserts only that the trial court should have applied an additional statutory cap of $500,000 to her bystander claim. However, she does not argue that the trial court awarded damages for a bystander claim, or otherwise erred in not awarding any such damages. Therefore, without a judgment awarding damages for a bystander claim, the issue of whether a separate statutory cap on general damages is available for that claim is not properly before us.

We note that Uniform Rules–Courts of Appeal, Rule 1-3 does allow us to consider issues that were not submitted to the trial court and not contained in specifications or assignments of error when "the interest of justice clearly requires" us to do so. However, we do not find that the interest of justice clearly requires us to consider the merits of a bystander claim in this case as no such claim was pled, submitted to the jury or the trial court for consideration, or awarded by the trial court.[6]

---

comfort, attention, care, and kindness that she had received from her late daughter, Mallory Young.

[6] However, even if we were to consider the merits of a bystander claim based on the record before us, the fact that Ms. Renfro chose to go to the scene of the accident after learning that the accident had occurred and did not remember seeing the vehicle or Mallory's body at the scene, does not require a finding that Ms. Renfro sufficiently proved a bystander claim under La.Civ.Code art. 2315.6, or otherwise renders the trial court's presumed denial of her claim manifestly erroneous. In *Lejuene v. Rayne Branch Hosp.*, 556 So.2d 559, 570 n.11, the Louisiana Supreme Court explained a bystander claim as follows:

"[T]he essence of the tort is the shock caused by the perception of the especially horrendous event." *Gates v. Richardson*, 719 P.2d 193 (Wyo.1986). *See also Corso v. Merrill*, 119 N.H. 647, 406 A.2d 300 (1979), which found that "(t)he

Because we find that this assignment of error is not properly before us, we affirm the trial court's reduction of twenty-nine percent of the total general damages awarded against DOTD ($1,914,000) to $500,000 in accordance with the statutory cap on damages provided by La.R.S. 13:5106.

**Amount of General Damages Awarded**

DOTD argues that the total of $6,600,000 awarded in general damages was impermissibly excessive and an abuse of discretion. We agree.

"[T]he role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award[.]" *Youn v. Mar. Overseas Corp.*, 623 So.2d 1257, 1260 (La.1993). Instead, an appellate court reviews whether the award under the facts and circumstances of the case is a "clear abuse of the 'much discretion'" vested in the jury, as finder of fact. *Id.* at 1261. "It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff

---

emotional injury must be directly attributable to the emotional impact of the plaintiff's observation or contemporaneous sensory perception of the accident and immediate viewing of the accident victim. Therefore, recovery will not be permitted for emotional distress when the plaintiff is merely informed of the matter after the accident...."

Similarly, in *Trahan v. McManus*, 97-1224, pp. 11-12 (La. 3/2/99), 728 So.2d 1273, 1279 (emphasis added), the Louisiana Supreme Court stated that the requirements of a bystander claim under La.Civ.Code art. 2315.6:

[S]uggest a need for *temporal proximity* between the tortious event, the victim's observable harm, and the plaintiff's mental distress arising from an awareness of the harm caused by the event. The Legislature apparently intended to allow recovery of bystander damages to compensate for *the immediate shock* of witnessing a traumatic event which caused the direct victim immediate harm that is severe and apparent but not to compensate for the anguish and distress that normally accompany an injury to a loved one under all circumstances.

The *Trahan* court also stated that "[a] non-contemporaneous onset of mental distress is not within the scope of the tortfeasor's liability, as limited by this court in *Lejeune*[, 556 So.2d 559] and by the Legislature in [La.Civ.Code] [a]rt[.] 2315.6[.]" *Id.* at 1279 n.8.

The evidence supports a conclusion that Ms. Renfro did not become aware of Mallory's injury by coming upon the scene of the accident immediately, or shortly after it occurred, so as to suffer the "immediate shock" contemplated by *Lejeune*, 556 So.2d 559, and *Trahan*, 728 So.2d 1273, and therefore she did not establish the requisite temporal proximity between the train accident, Mallory's injury or death, and Ms. Renfro's mental distress.

21

under the particular circumstances that the appellate court should increase or reduce the award." *Id.*

> The determination of the severity of mental anguish of distress resulting from the death of another is a fact question which depends upon several components, including, but not limited to, the closeness of the ties between the parties, the degree of love in the relationship, and the length of the relationship.

*Hill v. Shelter Mut. Ins. Co.*, 05-1783, 05-1818, p. 6 (La. 7/10/06), 935 So.2d 691, 695.

Ms. Renfro testified regarding her feelings after Mallory's death as follows:

A       Actually, it was kind of -- I was just kind of numb because I really couldn't believe it. I really didn't want to believe it. It was just a bad, bad time. It's like I went to this place, dark. It was a dark, dark place. It made me understand something, though. It made me understand why people kill theyself [sic] or drink theyself [sic] to death or drug theyself [sic] to death when something tragic happens in their life when they don't know God. It's a bad place to be.

Ms. Renfro further explained that, since Mallory's death, she no longer travels over the crossing at Eddy Street.

Shortly after Mallory's death, Ms. Renfro began counseling with Lee Franks, a licensed professional counselor. Ms. Franks concluded that Ms. Renfro was suffering from "major depression." She testified that Ms. Renfro "experienced some difficulty accepting the fact that [Mallory] had passed." She explained that Ms. Renfro developed difficulties falling asleep at night, cried daily at multiple times during the day, "seemingly could not . . . get a good grip on life at that time," "felt sad . . . constantly," and suffered from a lack of motivation. She further explained that Ms. Renfro "felt hopeless and . . . angry, resentful, frustrated," and was "discouraged."

Ms. Franks also testified that "[Ms. Renfro] missed [Mallory's] absence. She felt the loneliness. She just missed [Mallory's] presence, not being there, that she was absent." She further testified that Ms. Renfro suffered from anger at the

22

trauma of having learned of Mallory's death and trying to rush to the scene to "pick [Mallory] up and hug her[,]. . . and she was really hysterical" because she was not allowed to hug Mallory, her daughter.

Ms. Renfro saw Ms. Franks for counseling through May 13, 2003, which is approximately a year and half after the accident. Ms. Franks testified that Ms. Renfro "had begun to make a little bit of progress," although she "was not healed" and that she felt it was better for Ms. Renfro to work independently on her issues.

Carl Renfro, Ms. Renfro's husband, testified about the effects of Mallory's death on his wife, explaining that he "[did not] think [he] could put it into words . . . . It was---it's something that if you've never been through you can't explain it. It wasn't easy for her. It was very difficult. All I could do was just be by her side." He further explained the unique bond between Mallory and her mother as follows:

> A    They had the type of love for each other that if you have an opportunity to be a part of it you would want to enhance it as far as the beginning, and that was one of the driving forces that wanted me to be a part of their lives.

Raven Gradnigo, Mallory's sister, also testified at trial and explained her mother's grief as follows:

> A    I think for me I really didn't get a chance to grieve Mallory's death because of my mom and I seen [sic] how much pain she was in, and I had never seen her so -- so weak and so helpless. So I immediately needed to be there and be strong for her. My aunt, she came and she picked us up and when we got [to the scene] my mama, she just passed out, she just hit the ground, and some man picked her up and carried her and laid her in the back of the truck.

> . . . .

> A    I really -- the only thing I really, really remember is that everybody kept -- they wouldn't let us get to Mallory's body. They kept telling us we don't want to see her like that and they were -- held my mama and was restraining her as she was trying to get there and that's when she just -- I mean she just passed out, she was lifeless and had to carry her, and I stayed with my mama on the back of the truck

23

until we were able to get her awake and then bring her home and she was just in and out of it all night.

A    I just don't think that my mom has ever been the same since this happened. She's just been a totally different person. The life that she lived and, you know, things that she used to do changed, you know. She -- to me she was more energetic and, you know, she would do a lot more fun things before Mallory died and I think now my mom has this wall built up. I just think that she's just been hurt so much that she have [sic] a hard time. She feels guilty about having fun and doing things knowing that, you know, Mallory is not here. So she hasn't been the same.

While Mallory's death was tragic and certainly devastating to Ms. Renfro, an award of $6,600,000 in general damages based on the record presented is beyond that which could reasonably be assessed under the circumstances and an abuse of discretion. Therefore, we must now determine what is the highest amount of damages that was reasonably within the trial court's discretion. *Youn*, 623 So.2d 1257.

The highest amount of general damages awarded for the wrongful death of a child in cases cited by Ms. Renfro was $2,000,000.[7] We find $2,000,000 to be the highest reasonable amount of general damages that could have been awarded in this case. However, after reducing that amount by the twenty-nine percent of fault assessed to DOTD, and then limiting that amount by the $500,000 statutory cap provided by La.R.S. 13:5106, the trial court's ultimate award of $500,000 is affirmed.

In addition, our conclusions herein render moot DOTD's assertion that the trial court erred by including "grief and sorrow" and "mental anguish" as two separate and distinct categories of general damages on the jury verdict form.

**Assessment of Costs**

---

[7] *Hutto v. McNeil-PPC, Inc.*, 11-609 (La.App. 3 Cir. 12/7/11), 79 So.3d 1199, *writ denied*, 12-402 (La. 4/27/12), 86 So.3d 628, *cert. denied*, – U.S – , 133 S.Ct. 428 (2012).

In its final assignment of error, DOTD states that the trial judge erred in assessing all court costs against DOTD, and suggests that its liability for court costs should correspond with its allocated percentage of fault.

"Except as otherwise provided by law, the court may render judgment for costs, or any part thereof, against any party, as it may consider equitable." La.Code Civ.P. art. 1920. This article "has been liberally interpreted as granting the trial court broad discretion in apportioning costs as it deems equitable." *Boutte v. Nissan Motor Corp.*, 94-1470, p. 13 (La.App. 3 Cir. 9/13/95), 663 So.2d 154, 162 (citation omitted). Assessing a negligent party with all court costs when other parties are jointly liable is not a *per se* abuse of the trial court's discretion. *Id.* DOTD does not explain how the trial court's assessment is otherwise an abuse of its discretion, and we can find no abuse of discretion in the record.

## CONCLUSION

For the foregoing reasons we affirm the trial court's judgment. Costs of this appeal are divided equally between DOTD and Ms. Renfro.

**AFFIRMED.**

THALIA RENFRO

VERSUS

BURLINGTON NORTHERN SANTA FE RAILWAY COMPANY, ET AL.


**THIBODEAUX, Chief Judge, dissenting in part.**


I dissent from the majority's treatment of bystander damages and its conclusion that the general damages award of $6,600,000 was excessive.

The issue of a separate cap is indeed before us despite the lack of a specific pleading or lack of its inclusion in the jury instructions or the jury verdict form. The majority's rigid adherence to hypertechnical procedural rules abdicates a court's responsibility to render substantial—and deserved—fairness. Every pleading and all admissible evidence should be construed so as to achieve substantial justice, and courts are bound to determine the substance of a pleading. *See, e.g., Thompson v. Harrington*, 99-571, (La.App. 3 Cir. 10/13/99), 746 So.2d 652. The subordination of substance to form in the interest of procedural regularity has denied Ms. Renfro damages to which, from an evidentiary standard, she is entitled.

In her answer to the appeal, Ms. Renfro asserts that the trial court erred in reducing the general damages award to $500,000 pursuant to La.R.S. 13:5106. She argues that the statute, as it existed at the time of judicial demand, was interpreted by our supreme court to be "hopelessly 'ambiguous,'" and thus should be interpreted to limit her recovery to not one, but two damage caps. Ms. Renfro is correct.

Louisiana Civil Code Article 2315.2 authorizes certain enumerated persons to "recover damages which they sustained as a result of the death" of a person through the fault of another. Louisiana Civil Code Article 2315.6 authorizes statutorily enumerated persons who see another person become injured or "who come upon the scene of the event soon thereafter," to recover damages for the mental injury suffered as a result of seeing the other person's injury.

As this court explained in *Castille v. Louisiana Med. Mut. Ins. Co.*, 14-519, pp. 4-5 (La.App. 3 Cir. 11/5/14), 150 So.3d 614, 618-19:

> A claim for bystander damages is also a separate cause of action. Like a wrongful death and survival claim, a bystander claim is provided for in a separate article. *See* La.Civ.Code art. 2315.6. Moreover, a bystander claim arises at a different time than a survival and wrongful death claim. A survival action arises simultaneously with the commission of the tort against the direct victim and is transmitted to the beneficiaries upon the victim's death. *Guidry v. Theriot*, 377 So.2d 319 (La.1979), repudiated on different grounds in *Louviere v. Shell Oil Co.*, 440 So.2d 93 (La.1983). A wrongful death action arises when the victim dies. *Id.* Distinct from both actions is the bystander claim, which arises when a person observes an injury-causing event or soon after comes upon the scene of an injury and is contemporaneously aware that the event has caused severe harm to the direct victim. *Trahan v. McManus*, 97-1224 (La.3/2/99), 728 So.2d 1273. Further, a bystander claim compensates different injuries than a wrongful death and survival action. A survival claim compensates the direct victim for damages suffered from the time of injury until death. *Guidry*, 377 So.2d 319. A wrongful death claim compensates the beneficiaries for their own damages suffered from the moment of the direct victim's death and thereafter. *Id.* Distinct from both actions is the bystander claim, which compensates the bystander for the immediate shock of witnessing a traumatic event which caused the direct victim severe and apparent harm. *Trahan*, 728 So.2d 1273. Thus, by the same jurisprudential logic by which a wrongful death and survival claim are separate causes of action, a bystander claim is also a separate cause of action.

Since it is a separate cause of action and it is unnecessary to plead specific legal theories or causes of action as long as the essential facts are pleaded, the talismanic words "bystander damages" need not be specifically articulated.

At the time suit was filed on January 31, 2002, La.R.S. 13:5106(B)(2) provided:

2

In all suits for wrongful death of any one person, the total amount recoverable, exclusive of property damages, medical care and related benefits and loss of earnings or loss of support, and loss of future support, as provided in this Section, shall not exceed five hundred thousand dollars.

In *Lockett v. State ex rel DOTD*, 03-1767 (La. 2/25/04), 869 So.2d 89, the trial court found DOTD partially liable for a vehicular crash and awarded each parent $500,000 in general damages for the death of their daughter. The court of appeal affirmed. The supreme court granted DOTD's application for a writ to determine the proper construction of the statute. Finding the statute to be ambiguous and in derogation from the rights of tort victims, the supreme court determined that the statute must be strictly construed against application and in favor of the tort victims. The court explained "[La.R.S. 13:5106] does not restrict the application of the cap for all claims." *Id.* at 94.

Although the statute was subsequently amended to cap the total amount of general damages at $500,000 regardless of the number of plaintiffs or claims, damage caps are applied according to the date of judicial demand. *E.g. Brown v. Louisiana Indem. Co.*, 96-1393 (La.App. 3 Cir. 4/23/97), 693 So.2d 270, *writ granted*, 97-1344 (La. 9/19/97), 701 So.2d 139, *and aff'd in part, rev'd in part on other grounds*, 97-1344 (La. 3/4/98), 707 So.2d 1240. Because the supreme court's interpretation was the law in effect at the time of judicial demand, we must apply the statute to be consistent with the *Lockett* opinion. I, too, find the statute, as it read at the time of judicial demand, to be ambiguous regarding whether it allowed for a single cap for all claims or multiple caps for multiple claims. Thus, we must apply a strict construction against coverage. Consequently, Ms. Renfro has separate claims: those pursuant to La.Civ.Code arts. 2315.2 and 2315.6. Therefore, I conclude that Ms. Renfro is entitled to two statutory damages caps in accordance with the *Lockett* decision.

3

Moreover, I note that, at the time of the accident made the basis of this suit, La.R.S. 13:5106(B)(2) provided that, "[i]n all suits *for wrongful death* of any one person, the total amount recoverable . . . shall not exceed five hundred thousand dollars." (Emphasis added). Here, Ms. Renfro brings suit for the damages she sustained *for the wrongful death* of her daughter, Mallory, pursuant to La.Civ.Code 2315.2. Louisiana Revised Statutes 13:5106(B)(2), as it existed at the time of the instant accident, capped damages at $500,000 "in all suits *for wrongful death*," not in suits for bystander damages, which this court has previously explained is a separate cause of action.

Louisiana Code of Civil Procedure Article 2164 allows us to issue a judgment which is just and proper and supportable by the record. Similarly, La.Code Civ.P. art. 862 grants us the authority to issue a judgment for whatever relief we deem is proper, even if a party has not demanded that relief in his pleadings.

Mental anguish forms the basis for bystander damages under La.Civ.Code art. 2315.6. Clearly, the jury awarded $1,320,000 for "mental anguish" and $1,320,000 for "grief and sorrow." The jury also awarded $3,960,000 for "loss of love, affection, and companionship." Those items are typically associated with those damages occasioned by the wrongful death of an individual. It compensates the codal beneficiaries for the absence of love, the absence of affection, and the absence of companionship occasioned by the loss of a deceased. That is separate and apart from "grief and sorrow" and "mental anguish." Those are the damages immediately experienced by the codal beneficiaries. *Rachal v. Brouillette*, 12-794, p. 5 (La.App. 3 Cir. 3/13/13), 111 So.3d 1137, 1142, *writ denied*, 13-690 (La. 5/3/13), 113 So.3d 217, explained it succinctly: "[p]ut another way, grief is the absence of an emotion as a result of a loved one's death. Loss of love and affection, however, is the absence of an experience; specifically the absence of a

4

love previously bestowed." In my view, the element associated with bystander damages—mental anguish—was simply another way of awarding bystander damages under La.Civ.Code art. 2315.6.

Louisiana Code of Civil Procedure Article 862 requires a final judgment to "grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings and the latter contained no prayer for general and equitable relief." Typically, this provision gives authority to a trial court to grant relief, regardless of whether such relief was pleaded. *See*, e.g., *Johnson v. Fuselier*, 302 So.2d 721 (La.App. 3 Cir. 1974). However, this provision also authorizes a court of appeal to award certain damages, even though the plaintiff did not seek those damages. For instance, in *Kibbe v. Lege*, 604 So.2d 1366 (La.App. 3 Cir.), *writs denied*, 606 So.2d 540, 541 (La.1992), this court allowed the plaintiff to recover under quantum meruit, even though he had not pleaded it. In that case, the trial court concluded that the plaintiff was entitled to damages under a theory of equitable estoppel. However, this court ruled that equitable estoppel did not apply, but that the plaintiff could recover under quantum meruit. We also found that the plaintiff was not required to specifically plead quantum meruit, since the defendant was put on "fair notice" as to what the plaintiff was seeking by the factual pleadings. Bystander damages could be analogized in this case to quantum meruit. Since the plaintiff sought damages for mental anguish, the defendant was put on "fair notice" that the plaintiff was seeking such damages which formed the basis for bystander damages. *Kibbe* specifically said that Article 862 "supports *this* [court's] authority to allow recovery . . . ." *Id* at 1371. (Emphasis added).

The majority erroneously addresses the issue of excessive damages. Despite concluding that the damages are limited to $500,000 because of the statutory cap under La.R.S. 13:5106, it then proceeds to address the excessiveness issue under

5

the abuse of discretion standard.  Because of the $500,000 cap, that issue is now moot.  Why address it?  The award will be $500,000 whether the damages are $6,600,000 as the jury concluded, or $2,000,000 as the majority concludes.  Consequently, any discussion of the excessiveness of the award is unnecessary dictum.

For the foregoing reasons, I respectfully dissent.